1  **CARMEN A. TRUTANICH**, City Attorney
   **MICHAEL CLAESSENS**, Senior Assistant City Attorney
2  **CORY M. BRENTE**, Supervising Assistant City Attorney
   **DENISE C. JOHNSON**, Deputy City Attorney - (SBN191992)
3  200 North Main Street, 6th Floor, City Hall East
   Los Angeles, CA 90012
4  Email: denise.johnson@lacity.org
   Phone No.: (213) 978-7032, Fax No.: (213) 978-8785
5
   *Attorneys for Defendants* **CITY OF LOS ANGELES,**
6  **OFFICER CHRISTOPHER WREN and OFFICER JAMES DIAMOND**

7

8              **UNITED STATES DISTRICT COURT**

9             **CENTRAL DISTRICT OF CALIFORNIA**

10

11  J.D.R, et al.,                          ) Case No.: CV06-07466 VBF (MANx)
                                            ) *Complaint Filed: 11/21/06*
12                    *Plaintiffs,*         )
                                            ) **DEFENDANTS NOTICE OF**
13        vs.                               ) **MOTION AND THIRD MOTION IN**
                                            ) **LIMINE TO EXCLUDE CERTAIN**
14  CITY OF LOS ANGELES, OFFICER            ) **OPINION TESTIMONY FROM**
    CHRISTOPHER WREN, OFFICER               ) **PLAINTIFFS' EXPERT ROGER**
15  JAMES DIAMOND, and DOES 1               ) **CLARK PURSUANT TO FRE RULE**
    through 10, inclusive,                  ) **104(a); MEMORANDUM OF POINTS**
16                                          ) **AND AUTHORITIES**
                      *Defendants.*         )
17  ─────────────────────────────────      ) **PTC DATE:      January 21, 2010**
                                            ) **PTC TIME:      2:00 p.m.**
18                                            **PLACE:         Courtroom 9**

19                                            **Trial Date:    February 9, 2010**

20                                              **U.S. District Judge**
                                              **Valerie Baker Fairbanks**
21

22  **TO ALL PARTIES AND TO THEIR ATTORNEY OF RECORD HEREIN:**

23          PLEASE TAKE NOTICE that Defendants CITY OF LOS ANGELES, OFFICER

24  CHRISTOPHER WREN and OFFICER JAMES DIAMOND hereby move this Court on

25  January 21, 2010 at 2:00 p.m., or as soon thereafter as this Court may hear said motion in

26  limine, at the above-entitled Court, before jury selection or commencement of the trial, for

27

28                                          1

an order directing Plaintiffs' expert witness Roger Alma Clark not to convey to the jury in any way opinions and/or assumptions regarding the following:

1. Firearm analysis involving Officer Wren's or Officer Diamond's firearms

2. Trajectory analysis related to any bullets fired from the officers' firearms;

3. Ejection patters of casings expended from the officers' firearms;

4. Wound ballistic evidence or any opinions related to wound ballistics;

5. Any opinion regarding whether Brayland Randolph had a gun in his hand at the time of the shooting;

6. The quality of the subsequent investigation performed by the Los Angeles Police Department following the shooting of Brayland Randolph;

7. Any opinion that any police officers "planted" evidence at the scene of the incident;

8. Any opinions related to the service of the search warrant which preceded the shooting incident.

Roger Clark's  Rule 26 Report is attached hereto as  "Exhibit 1."  This motion is made following the conference of counsel pursuant to Local Rule 7-3 which took place on December 14, 2009.

This motion is made upon the grounds that Roger Clark lacks the requisite expertise to testify as to those matters, and in the event any of the below listed matters are conveyed to the jury, the Defendants would be subjected to severe prejudice which could not be cured by any subsequent curative instruction from the court.

This motion is based upon this motion, the memorandum of points and authorities in support, the records and files herein, the Rule 26 Report and deposition transcript of

///

///

///

2

1  Roger Clark and such further and other evidence or argument that may be admitted at the

2  hearing.

3      DATED: December 29, 2009

4                      **CARMEN A. TRUTANICH**, City Attorney
                    **MICHAEL L. CLAESSENS**, Senior Assistant City Attorney

5                      **CORY BRENTE**, Supervising Assistant City Attorney
                    **DENISE C. JOHNSON**, Deputy City Attorney

6

7                        /S/ Denise C. Johnson
              By _____

8                      **DENISE C. JOHNSON,** Deputy City Attorney

9                      *Attorneys for Defendants* **CITY OF LOS ANGELES, OFFICER CHRISTOPHER WREN, and OFFICER JAMES DIAMOND**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                        3

# TABLE OF CONTENTS

**Page No(s):**

MEMORANDUM OF POINTS AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II.   FACTUAL AND PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . 4

III.  ADMISSIBILITY OF EXPERT WITNESS TESTIMONY . . . . . . . . . . . 5

IV.   PLAINTIFF'S EXPERT LACKS THE SPECIAL KNOWLEDGE, SKILL, EXPERIENCE, AND TRAINING TO QUALIFY AS AN EXPERT ON CERTAIN ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    A.   Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    B.   The Court Must Exclude Roger Clark's Opinions That Are Not Based on His Expertise as a Police Practices Expert . . . . . . . . . . . . . . . . . . . 9

    C.   Trajectory Analysis and Wound Ballistics . . . . . . . . . . . . . . . . . . . . 10

    D.   Ejection Pattern Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

V.    TESTIMONY THAT DOES NOT ASSIST THE TRIER OF FACT IN UNDERSTANDING THE EVIDENCE OR DETERMINING A FACT IN ISSUE SHOULD BE PRECLUDED . . . . 14

        A.   The Quality of the Shooting Investigation Is Not At Issue . . 14

        B.   Mr. Clark's Opinions Regarding the Service of the Search Warrant are Irrelevant . . . . . . . . . . . . . . . . . . . . . . . . . 19

VI.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

# **TABLE OF AUTHORITIES**

**Page No(s):**

## **CASES**

Anderson v. Raymond Corp., 340 F.3d 520, 523-524 (8th Cir. 2003)  . . . . . . . . . . . . . . . 7

Conde v. Velsicol Chem Corp. 24 F.3d 809, 814 (6th Cir. 1994 . . . . . . . . . . . . . . . . . 7

Claar  vs. Burlington Northern, 29 F.3rd 499 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . 6

Daubert  vs. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125

    L.Ed. 2d 469 (1993)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-7, 9

General Elect. Co. v. Joiner, 522 U.S. 136, 141-142, 118 S.Ct. 512, 519 (1997) . . . . . 5, 7

Hall vs. Baxter Healthcare, 947 F.Supp. 1387 (U.S. ORE 1996)  . . . . . . . . . . . . . . . . 6

Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152, 119 S.Ct. 1167, 1176 (1999) . . 7

Lust vs. Merrill Dow Pharmaceuticals, 89 F3rd. 594 (9th Cir. 1996)  . . . . . . . . . . . . . . 6

Moore v. Ashland Chem. Inc., 151 F.3d 269, 276 (5th Cir. 1998)  . . . . . . . . . . . . . . . 5

Nelson v. Tennessee Gas Pipeline Co., 243 F.3d 244, 250 (6th Cir. 2001) . . . . . . . . . . . 7

Paoli R.R. Yard PCB Litig, 35 F.3d 717, 745 (3d Cir, 1994)  . . . . . . . . . . . . . . . . . . . 7

## **STATUTES**

Rule 56(c) of the Federal Rules of Civil Procedure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Fed. Rule. Evid. 702  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 7, 9

Fed. Rule Evid., Rule 703  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

FRE Rule 104(a)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-7

## **EXHIBITS**

Exhibit 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5, 10, 13, 15-17

Exhibit 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-14, 16-18

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.

3

## INTRODUCTION

4      By this motion, the Defendants request an order in limine precluding Plaintiffs'

5   expert, Roger Clark, from rendering various opinions regarding aspects of the incident

6   given his lack of expertise in those areas.  Also, several of the opinions he intends to offer

7   are improper opinions for an expert witness to offer.

8

## II.

9

## FACTUAL AND PROCEDURAL BACKGROUND

10      On May 11, 2005 Officers from LAPD's narcotics unit as well as gang enforcement

11   officers from LAPD's Southwest Division went to a home located at 3791 South

12   Cimarron Street for the purpose of serving a search warrant based upon suspected

13   narcotics activity going on inside the house.  When officers arrived, they were spotted by

14   a person at the house who fled on foot when he saw the officers.  Officers Christopher

15   Wren and James Diamond immediately ran after the individual who had fled towards the

16   backyard area of the house.  As the officers ran to the backyard, they heard persons

17   running out of the house into the backyard area.  They also heard the sounds of persons

18   jumping over the side and back fences.

19      When Officers Wren and Diamond rounded the corner of the house and entered the

20   backyard, they observed Brayland Randolph running away from them towards the side

21   gate.  The officers immediately noticed that Randolph had a handgun in his left hand

22   pointed back at them.  Both officers shouted "Gun!" to warn the other officers running up

23   behind them that a suspect was armed with a gun.  Randolph kept the gun pointed at the

24   officers as he jumped the side fence into the adjacent yard.  In fear for the lives, Officers

25   Wren and Diamond opened fire on Randolph.  Randolph was struck by several of the

26   officers' bullets and collapsed on the ground of the adjacent yard.  He was later

27

28                                                4

1  pronounced dead.  His firearm was recovered from the tall grass next to the fence he had

2  jumped over.  The coroner ruled the cause of dead was due to multiple gunshot wounds.

3      Randolph's minor children filed this lawsuit alleging the officers wrongfully shot

4  and killed their father in violation of his 4th amendment rights.  They further alleged that

5  the City of Los Angeles maintained a policy, practice or custom of fostering the alleged

6  unlawful conduct.  The Defendant Officers deny these allegations, given that they shot

7  Randolph in defense of their lives while Randolph pointed a loaded gun at them.

8                                             **III.**

9                      **ADMISSIBILITY OF EXPERT WITNESS TESTIMONY**

10      The admissibility of all expert testimony is governed by FRE Rule 104(a), wherein

11  the proponent must prove by a preponderance of the evidence that the testimony is

12  reliable. <u>Moore v. Ashland Chem. Inc.,</u> 151 F.3d 269, 276 (5th Cir. 1998).  The

13  admissibility of expert opinion testimony turns on:  (1) whether the opinion is based on

14  "scientific, technical, or other specialized knowledge;" (2) whether it would "assist the

15  trier of fact" in understanding the evidence or determining a fact in issue; and (3) whether

16  the expert has appropriate qualifications, i.e., some special knowledge, skill experience,

17  training or education on the subject matter.  (Fed. Rule Evid., Rule 702.)

18      The determination of admissibility of expert witness opinion testimony under

19  Federal Rule 702 of the Federal Rules of Evidence is to be undertaken by the District

20  Court utilizing the analysis set forth in the seminal case of <u>Daubert  vs. Merrell Dow</u>

21  <u>Pharmaceuticals, Inc.,</u> 509 U.S. 579, 113 S.Ct. 2786, 125 L. Ed. 2d 469 (1993).  Most

22  significantly, the Court must determine whether the witness possesses specialized

23  knowledge within the areas within which he purports to testify.   <u>Daubert vs. Merrill Dow</u>

24  <u>Pharmaceutical</u>, 509 U.S. 579 (1993).  Moreover, the Court has broad discretion in

25  making the determination whether to exclude expert testimony pursuant to Federal Rule

26  702.  <u>General Elect. Co. v. Joiner</u>, 522 U.S. 136, 141-142, 118 S.Ct. 512, 519 (1997).

27

28                                             5

1  Ultimately, the burden of laying the proper foundation for the admission of expert

2  opinions is on the proffering party, and as such, the proponent must prove this by a

3  preponderance of the evidence.  Daubert v. Merrell Dow Pharmaceuticals Inc., *supra,* at

4  592.[1]

5      In Daubert, the United States Supreme Court directed the Federal Courts, first to

6  determine whether the proffered expert's opinion is based upon "scientific knowledge" by

7  focusing not on the conclusions of the experts, but rather on their methodology.  Daubert

8  vs. Merrell Dow Pharmaceuticals, Inc., *supra,* at 595.  In the case of medical expert

9  testimony, admissible testimony must be based upon facts or data, reasonably relied upon

10  by experts in the field.  Thus, in deciding whether proffered expert testimony meets

11  Daubert's requirements, the District Court's foremost objective must be to rule out

12  subjective belief or unsupported speculation.  Rodgers vs. Ford Motor Company, 152

13  F.Supp 606 (N.D. Indiana 1997).  As a consequence, the assessment of whether proffered

14  expert testimony is admissible under Federal Rule 702 is a preliminary matter for the

15  Court under Rule 104(a).  Accordingly, the party offering the evidence must explain the

16  expert's methodology and demonstrate in some objectively verifiable way, that the expert

17  has both chosen a reliable scientific method and followed it faithfully.  Hall vs. Baxter

18  Healthcare, 947 F.Supp. 1387 (U.S. ORE 1996).  In other words, the party presenting the

19  evidence must show that such evidence is based on "sound science" and "good grounds"

20  based on what is known.  Claar  vs. Burlington Northern, 29 F.3rd 499 (9th Cir. 1993);

21  See also; Lust vs. Merrill Dow Pharmaceuticals, 89 F3rd. 594 (9th Cir. 1996).

22      In practical terms, the Court must consider the "reliability" of the expert by

23  determining whether the testimony:  (1) is based on sufficient facts or data; (2) the product

24  of reliable principles and methods; ***and*** (3) the witness applied the principles and methods

25  reliably to the facts of the case.  (Fed. Rule. Evid. 702, and Adv. Comm. Note.)  As the

26  _____

27  [1] A copy of Roger Clark's Rule 26 Report is attached hereto as "Exhibit 1."

28                                            6

1   Court noted In re Paoli R.R. Yard PCB Litig, 35 F.3d 717, 745 (3d Cir, 1994), "any step

2   that renders the analysis unreliable . . . renders the expert's testimony inadmissible."

3        Moreover, the Court must perform a screening function to ensure that the expert's

4   testimony "is the product of reliable principles and methods." (Fed Rule Evid. 702);

5   Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152, 119 S.Ct. 1167, 1176 (1999).

6   Consequently, the Court may exclude an expert's conclusion based on an obvious mistake

7   in the expert's investigation or reasoning process (General Elect. Co. v. Joiner, *supra,* at

8   146), when there are analytical gaps between the data and the opinion (Conde v. Velsicol

9   Chem Corp. 24 F.3d 809, 814 (6th Cir. 1994)), or where the opinion is purely speculative

10  (Nelson v. Tennessee Gas Pipeline Co., 243 F.3d 244, 250 (6th Cir. 2001)), among other

11  things.

12       Ultimately, the Plaintiffs have the burden for laying the proper foundation for the

13  admission of Mr. Clark's opinions and must do so by a preponderance of the evidence.

14  Daubert v. Merrell Dow Pharmaceuticals Inc., *supra,* at 592.  When  objections are made,

15  the Court must make a preliminary determination regarding the admissibility of such

16  opinion and the qualifications of the person attempting to offer such evidence.  (Fed. Rule

17  Evid., Rule 104(a); Fed. Rule Evid., Rule 702, Advisory Comm.)  A Court's review of

18  deposition testimony is deemed sufficient and not an abuse of discretion.  Anderson v.

19  Raymond Corp., 340 F.3d 520, 523-524 (8th Cir. 2003).

20                          **IV.**

21         **PLAINTIFF'S EXPERT LACKS THE SPECIAL KNOWLEDGE,**
22        **SKILL, EXPERIENCE, AND TRAINING TO QUALIFY AS AN**
               **EXPERT ON CERTAIN ISSUES**

23  **A.**    **Background**

24       This case will undoubtedly encompass expert witnesses that will attempt to assist

25  the jury in determining of what occurred on the day of the incident.  However, allowing

26  Roger Alma Clark, Police Tactics Expert, to render opinions in areas that he is not

27

28                     7

1  qualified will simply result in undue prejudice to the Defendants.

2      A review of Mr. Clark's Rule 26 Report and his recent deposition transcript reveal
3  that Mr. Clark is testifying to matters which he lacks sufficient facts, data, methodology
4  and qualifications.  Specifically, Mr. Clark was retained as a tactics expert in this case, but
5  has provided certain opinions that the Defendants believe are beyond his qualifications,
6  and they are not supported by facts and data.

7      The Defendants have retained Jimmy Trahin, a retired LAPD Officer and a
8  ballistics and trajectory expert, to analyze the trajectories (paths) of the rounds fired by the
9  officers.  Mr. Trahin completed an intense reconstruction of the entire shooting incident at
10  the location where the incident occurred. Mr. Trahin took measurements of the location of
11  the physical evidence at the scene related to the positions of the officers who fired the
12  rounds.  Mr. Trahin also conducted extensive testing procedures of the actual firearms
13  used by the officers in this incident to determine the ejection patterns caused by the bullet
14  casings as they were ejected from the officers' firearms.

15      The Defendants also retained Dr. Martin Fackler, a medical doctor and a  world-
16  renowned wound ballistics expert.  Dr. Fackler will testify regarding his analysis of the
17  trajectories of the bullets through the decedent's body, and comment on his conclusions
18  regarding the manner in which the bullets entered the decedent's body based upon the
19  physical evidence visible on the body.  His conclusions will include information regarding
20  the decedent's body position(s) at the time the bullets struck him.

21      The Plaintiffs have not retained a trajectory expert, nor have they retained a wound
22  ballistics expert.  The only expert retained by the Plaintiffs is Roger Clark, whose limited
23  expertise is in the field of police tactics based upon his career as a Los Angeles County
24  Deputy Sheriff.  Mr. Clark has no expertise beyond that of a working police officer.
25  However, Plaintiffs intend to elicit opinions from him at trial that fall beyond the scope of
26  his expertise as evidenced by his Rule 26 report [attached hereto as Exhibit 1] and

27

28                                          8

1   deposition testimony [portions of which are attached hereto as Exhibit 2].

2       In his Rule 26 report and deposition, Mr. Clark offers opinions related to firearm

3   analysis.  Specifically, his opinions relate to the trajectories of the bullets fired by the

4   officers' weapons, including opinions related to wound ballistics.  In addition, Mr. Clark

5   attempts to offer opinions based upon the ejection patterns of the casings fired by the

6   officers' firearms, despite his lack of information and expertise in this field.  The

7   Defendants are hereby asking this Court to preclude such testimony by Mr. Clark as he

8   lacks the expertise to testify as an expert in either field.

9   **B.    The Court Must Exclude Roger Clark's Opinions That Are Not Based on His**

10      **Expertise as a Police Practices Expert**

11      Pursuant to Federal Rule 702, the Court acts as the gatekeeper and is charged with

12  regulating the subjects and theories about which an expert may testify to ensure that the

13  proposed testimony is "scientific", i.e., grounded in the methods and procedures of

14  science. Additionally, the Court must determine whether the witness possesses the

15  requisite knowledge to render an opinion, consisting of more than subjective belief or

16  unsupported speculation.  Mr. Clark may have carried a department-issued duty weapon

17  while employed several decades ago as a sworn-member of the L.A. Sheriff's Department,

18  but that does not qualify him to render the scientific opinions he attempts to provide in this

19  case.

20      During the years since the <u>Daubert</u> decision, the Ninth Circuit has consistently

21  rejected expert opinion of the type offered here.  In supporting his above-listed opinions,

22  Mr. Clark has no background in the field of firearm analysis other than his life

23  experiences of carrying a firearm.  Though he may have carried a firearm while employed

24  as a sworn member of the sheriff's department, he was not trained in the analysis of bullet

25  trajectories or casing ejections.  If the issues in this cases involved the carrying or manner

26  of pulling a trigger of a firearm, he would arguably have some knowledge of these issues

27

28                                        9

1    beyond that of a lay person.  However, trajectory analysis involves taking extensive
2    measurements, determining angles and completing scientific calculations which reveal the
3    location of a firearm at the time a bullet was fired.  Typically, a full reconstruction of the
4    shooting incident must be performed in order to measure angles and calculate trajectories.
5    Roger Clark has completed no such reconstruction of the shooting incident.  Furthermore,
6    casing ejection analysis requires testing of specific makes/models of firearms to develop a
7    bank of knowledge as to how particular firearms eject their casings.   Mr. Clark has no
8    training in these fields and conducted no tests or calculations related to these issues in this
9    case.  Therefore, he lacks the requisite expertise to testify as to these matters.

10   **C.      Trajectory Analysis and Wound Ballistics**

11          Mr. Clark opines that the decedent, Brayland Randolph, was laying face-down on
12   the ground when he was shot in the back by the Defendant officers.  In order to support
13   his opinion, Mr. Clark states on page 3, paragraph two of his Rule 26 report that "[t]he
14   trajectories are such that they entered in to his back and traveled forward towards the front
15   of his body. The trajectories of the bullets also points to the fact that Mr. Randolph was
16   shot while he was prone on the ground (as was observed by at least one witness.)"
17   [Exhibit 1].  Furthermore, in his deposition taken on June 9, 2009, Mr. Clark opines that
18   the trajectories "speak to Randolph being bent forward, consistent with being down. . .
19   And the trajectories would match, a number of them through his body as he was down."
20   [Exhibit 2, page 19, lines 16-19] See also the following dialogue from his deposition:

21          "Q:    Now, your opinion that he [decedent] was on the south side of the fence face
22                 down on the ground when at least some of the shots were fired, you
23                 mentioned that was based upon the location fo the casings, some of the
24                 casings being on the south side of the fence.  Correct?

25          A:     Yes.

26          Q:     And what else?

27

28                                            10

1     A:    Passage of the bullets through his body, which angle in such a way that he's

2           either pitched forward or he's down on the ground and the officers standing,

3           the angle would accommodate the angle of entry into his body.

4     Q:    Wouldn't you agree, though, that that type of analysis is something left to a

5           wound ballistics expert?

6     A:    Yes."

7 [Exhibit 2, page 27, lines 4-17]

8 In fact, Mr. Clark even admits later in his deposition that he is not convinced that his

9 opinion is accurate when he states "I'm somewhat neutral in terms of Brayland Randolph

10 laying on his chest and abdomen on the ground." [Exhibit 2, page 58, lines 19-21] These

11 opinions that he offers in his report and at deposition are clearly reserved for a medical

12 doctor and/or trajectory expert who have training, education and experience analyzing

13 such evidence. Mr. Clark offers his opinions without any knowledge whatsoever, and a

14 jury could be easily misled by such baseless and groundless opinions.

15      Mr. Clark, by his own admission, is not an expert in trajectory analysis of bullets

16 fired by firearms. In addition, he admits that he is not a wound ballistics expert either. At

17 his deposition, the following discussion took place:

18     "Q:   You would agree that, at least as it pertains to this case, you're not

19          putting yourself out as a trajectory expert?

20     A:    No.

21     Q:    You don't agree or you do agree?

22     A:    I do agree with you, I am not.

23     Q:    Would you also agree that you're not intending to testify in this case as a

24          wound ballistics expert?

25     A:    No. I take the autopsy report on face value."

26 [Exhibit 2, page 26, lines 5-13]

27

28                      11

1      "Q:    But you would agree you're not a ballistics expert?

2       A:    Right.  And I've said that many times."

3   [Exhibit 2, page 23, lines 14-16]

4       Furthermore, Mr. Clark failed to conduct or review any independent analysis

5   related to the trajectories of the rounds fired.  Again, at his deposition Mr. Clark offered

6   the following admission:

7      "Q:    Did you conduct any type of trajectory analysis where you went to the scene,

8              took measurements, did the calculations, anything to that

9              effect?

10      A:    No.  And as you know I went to the scene and I looked at it just to

11             get the sense of the landscape but I did not do any of that because I

12             did not have all of the data and I was never asked to do that."

13  [Exhibit 2, page 25:22 - 26:4]

14  Clearly, Mr. Clark cannot offer evidence related to the paths of each of the officers'

15  bullets because he has not expertise in this field.  The coroner may be called to testify as to

16  the trajectories he *observed* at autopsy.  Dr. Fackler will offer expert testimony related to

17  the decedent's body position at the time certain rounds were fired based upon his expertise

18  in the area of wound ballistics through the body–a field in which only medical doctors can

19  offer expert opinions.  Jimmy Trahin can testify as to the mathematical trajectories he

20  computed based upon his reconstruction of the shooting incident and his expertise in

21  trajectory analysis.  Mr. Clark does not possess any of these skills and lacks expertise in

22  all these fields.  Therefore, he cannot qualify, by his own admission, as an expert for

23  purposes of offering testimony at trial.  Therefore, his testimony in these areas should be

24  excluded.

25  **D.    Ejection Pattern Analysis**

26      The analysis of ejection patterns requires more than general knowledge of how

27

28                                            12

1   casings are ejected by particular brands of firearms. Each individual firearm may eject
2   casings differently based upon the characteristics of the gun as well as the movement or
3   shooting position of the officer firing the gun. At deposition, Mr. Clark admits that "even
4   among the same makes the characteristics of how the cartridge ejects has a lot to do with
5   the ammunition and even among the ammunition there's going to be some differences."
6   [Exhibit 2, page 24, lines 17-20] An ejection pattern analysis must be performed in order
7   to accurately offer an opinion as to the position of a shooter based upon the location of the
8   casings.

9       Mr. Clark intends to offer opinions of the officers' shooting positions based upon
10   the ejection patterns of the casings fired from the officers' firearms. In his Rule 26 Report
11   he opines that "[t]he location of the spent cases are indicative of semi-automatic hand
12   guns that were at or beyond the fence so that the ejected cartridge would land in the rear
13   yard where Mr. Randolph fell (3793 Cimarron). This would occur if the shooting
14   officer(s) were at, or leaning over the fence and shooting at Mr. Randolph while he was on
15   the ground next to the yard--not from a shooting position north of the fence (as stated by
16   the officers)." [See Exhibit 1, page 2, last paragraph] He failed to conduct any type of
17   ejection pattern analysis, as evidenced by his own testimony at deposition:

18       "Q:   Have you conducted yourself an ejection pattern test on either officer's
19             firearm?

20       A:    No. I'd have to have the [firearm] of course and the ammunition and do a
21             substantial amount of testing.

22       Q:    And you haven't seen the documentation of the actual ejection pattern testing
23             that was done on these firearms?

24       A:    No.

25       Q:    You haven't seen the video of the fire ejection testings?

26       A:    Not for these weapons, no."

28                                           13

1 [Exhibit 2, page 25, lines 1-11]

2      Given Mr. Clark's complete lack of analysis with respect to the ejection patterns

3 of the involved firearms, coupled with his lack of expertise as an ejection pattern expert,

4 this Court should preclude him from offering any opinions related to the positions of

5 either Defendant officer at the time they fired their rounds when those opinions are based

6 upon the location of the expended casings recovered at the scene.  To allow such opinion

7 testimony to go to the jury would mislead the jury, as they would believe that Mr. Clark

8 possessed some expertise in this field (which he does not), or had some specific

9 knowledge (which he does not).

10                                    **V.**

11          **TESTIMONY THAT DOES NOT ASSIST THE TRIER OF**
            **FACT IN UNDERSTANDING THE  EVIDENCE OR**
12          **DETERMINING A FACT IN ISSUE SHOULD BE PRECLUDED**

13      It is well settled that the Court has broad discretion in excluding evidence unless the

14 proponent can demonstrate that the probative value in assisting the jury substantially

15 outweighs the probability that its admission will create substantial danger of undue

16 prejudice, confusion of the issues or misleading of the jury, which Plaintiffs cannot do

17 here. (Fed. Rule Evid., Rule 703, Advisory Comm. note (2000)).  Mr. Clark's blanket

18 opinions are objectionable for a whole host of reasons - - namely, he is devoid of any

19 experience or education that would assist the trier of fact in determining any issues

20 relevant to this case.

21

22 **A.     The Quality of the Shooting Investigation Is Not At Issue**

23      Mr. Clark is severely critical of LAPD's shooting investigation, and argues in his

24 report that a sub-standard investigation is indicative of a conspiracy to cover-up a bad

25 shooting.  However, criticism of LAPD's investigation is not applicable to any of the

26 causes of action before this Court.  Plaintiffs have not brought a conspiracy claim against

27

28                                    14

1  the City or the LAPD.  Such testimony would be prejudicial under Fed. Rule Evid Rule

2  703 and would mislead the jury.

3      Nevertheless, Mr. Clark opines in his Rule 26 report that the investigation was

4  flawed because (1) the suspect's firearm was not located immediately, and (2) there was

5  no DNA analysis performed on the suspect's firearm.  Not only does Clark speculate the

6  basis for these opinions, but these opinions are not relevant to any issue that will be tried

7  before the jury.

8      At some point during the shooting incident, Brayland Randolph jumped a four-foot

9  high chain link fence with his handgun in his hand.  While going over the fence, he

10 dropped his handgun, which was later recovered adjacent to that fence, but obscured by

11 tall grasses and a piece of wooden lattice fence.  Given that the shooting officers were

12 immediately removed from the scene of the shooting, they were not in a position to assist

13 the investigators in finding the gun.  After over three hours of searching, Officer Wren

14 was brought back to the shooting scene and asked where the suspect jumped the fence.

15 Moments after Officer Wren indicated the location on the fence where Randolph had

16 jumped, the gun was found.

17     Mr. Clark is critical of the investigating detectives for not finding the gun sooner.

18 Clark specifically states in his report that "[t]he fact that the alleged gun was not located

19 for such an inordinate amount of time–well beyond anything reasonably expected under

20 the circumstances–is a very troubling aspect of this case." [Exhibit 1, page 4, last

21 paragraph].  However, Clark fails to indicate why that fact is troubling, or what that delay

22 indicates in terms of whether or not the officers were justified in using deadly force.

23 Clark goes on to hint that the lack of DNA analysis on the suspects gun may be indicative

24 of a flawed, or corrupt investigation. Reading between the lines, one might presume that

25 Clark is insinuating that the gun was "planted" and that Randolph never had a gun at all.

26     In fact, Clark adds on page 5 of his report that "[i]t is a known fact in the profession

27

28                                    15

1 and to all OIS investigators that 'throw downs' or 'throw aways' are used by corrupt
2 officers to justify their otherwise illegal uses of lethal force." [Exhibit 1, page 5]  "That
3 the gun could not be located for over four hours and only after the facts of the shooting
4 became apparent to the investigators remains as a glaring issue in this case." [Exhibit 1,
5 page 5]

6        In his deposition, Clark expands on his opinions.  With respect to his opinion
7 regarding the investigation itself, Clark states that in his report he "comment[s] somewhat
8 on the investigation that occurred, some of the deficiencies. . .on the part of the OIS
9 detectives. [Exhibit 2, page 6, lines 9-14] Then he goes on to hint that the gun may have
10 been planted, but fails to provide any factual basis for that opinion, nor does he indicated
11 he has any special knowledge related to that accusation.  In fact, he admits that that is only
12 his own personal opinion:

13        "Q:   So it appears your first opinion is that the suspect, you believe the
14              suspect–and when I say suspect I mean Brayland Randolph–did not have a
15              gun.
16        A:    [Clark] I do.  But that's an issue obviously for the jury to determine.  But I
17              personally do not believe he had a gun.
18        Q:    Also, you seem to hint that you believe the gun that was found at the scene
19              was planted?"
20        A:    [Clark]  Well, that's a very dark possibility.
21        Q:    Is that your opinion?
22        A:    [Clark]  I think that if he was not armed then the explanation of how the gun
23              got there, there's a variety of explanations but. . ."
24 [Exhibit 2, page 15, lines 2-8]
25 And regarding his insinuations that a DNA analysis should have been performed, Clark
26 admits that such an analysis is not required.
27

28                                        16

1   "Q:   There is no legal requirement, is there, for a department to do a DNA

2         analysis?

3    A:   Oh, goodness.  I never thought of it that way.  I think. . . I suppose not."

4   [Exhibit 2, page 50, lines 12-15]

5   Clark admits that these opinions are not based upon his special knowledge or expertise but

6   upon his personal feelings.

7   "Q:   So your opinion was the suspect did not have a gun when he was shot?

8    A:   My personal belief, you need to say that because I don't believe that has an

9         issue–I think there's substantial evidence that the jury will consider whether

10        or not he was armed.

11   Q:   So in terms of your assignment or your retention as a police practices expert

12        in this case, that's not one of your professional opinions, that's more of a

13        personal caveat.  Correct?

14   A:   Right.

15   Q:   So you don't really have an opinion whether or not he had the gun at the time

16        he was shot?

17   A:   Correct.

18   Q:   So then would it be fair to say that your personal opinion that the gun may or

19        may not have been planted is also not something related to your professional

20        opinions in this case?

21   A:   Correct."

22  [Exhibit 1, page 18, line 11 through page 19, line 4]

23  "Q:   Other than your personal opinion that it's possible that members of the OIS

24        investigation team, OIS meaning Officer Involved Shooting, could have

25        planted a firearm at the scene of this incident, you have no evidence to base

26        that on.  Correct?

27

28                                    17

1    [Objection made by counsel]

2    A:    I have no evidence that that occurred.

3    Q:    So essentially you're speculating?

4    A:    Based on what's before me, it's an educated speculation."

5  [Exhibit 2, page 35, line 24 - page 36, line 9]

6  Mr. Clark goes on to admit that he has no factual basis for his opinions.

7    "Q:    Do you have any evidence that Officers Wren and Diamond knew any of the

8          OIS detectives that went to the scene?

9    A:    I have no such knowledge.

10   Q:    So no reason to think that the OIS detectives would have tried to cover up

11         some kind of inappropriate conduct on behalf of those officers?

12   A:    On the basis of a personal relationship?

13   Q:    Yes.

14   A:    No.  Only what – there's a tight relationship among all officers, obviously.

15         It's a brotherhood.

16   Q:    All police officers?  All LAPD officers?

17   A:    I've always felt that way."

18  [Exhibit 2, page 40, lines 1 - 13]

19   "Q:    You would agree, wouldn't you, the fact that OIS detectives couldn't find the

20         gun for some time cannot be attributed to Officers Wren and Diamond?

21   A:    Yes."

22  [Exhibit 2, page 49. lines 8-11]

23       Clearly, Mr. Clark has allowed his own personal prejudices cloud his judgment and

24  affect the opinions he is prepared to render in this case.  His personal opinions are

25  irrelevant, and should be excluded as they are not based upon any expertise or personal

26  knowledge that would assist the trier of fact.  Any opinions Clark may have regarding

27

28                                         18

Randolph being armed or unarmed, or regarding the quality of the shooting investigation including the lack of DNA analysis, or regarding the planting of the suspect's firearm, are argumentative, inflammatory, and lack a factual basis.  For these reasons, these opinions must be excluded.

**B.    Mr. Clark's Opinions Regarding the Service of the Search Warrant are Irrelevant**

During his deposition, Mr. Clark indicated that he intended to offer a trial his opinion that the service of the search warrant on the location of the shooting was flawed.  His opinions are related to the actions of the supervisors and the positioning of resources, not to the shooting that occurred later.  However, there are no allegations in this lawsuit related to the service of the search warrant, and neither Defendant Officer is accused of unlawfully serving the warrant.  Therefore, any of Clark's opinions are irrelevant and wasteful of judicial resources.

"Q:    [D]o you have any other opinions regarding improper conduct of the shooting officers or any other officers?

A:    I'm glad you said other officers because the commanding officer of the event was–certainly demonstrated an incompetence in the way and the method that this takedown of the location was going to occur."

[Exhibit 2, page 41 lines 15-21]

Clark then spends three pages of deposition transcript talking about mistakes he viewed in the manner in which the service of the search warrant was organized.  Since none of the allegations of this complaint are related to the service of the search warrant, such opinion testimony must be excluded as it is irrelevant.

///

///

19

1

2

## VI.

## CONCLUSION

For the reasons set forth above, Mr. Clark's testimony should be limited only to areas involving police tactics, nothing more.

DATED:     December 29, 2009

**CARMEN A. TRUTANICH,** City Attorney
**MICHAEL CLAESSENS,** Senior Asst. City Attorney
**CORY M. BRENTE,** Supv. Assistant City Attorney


/S/ Denise C. Johnson

By: _____
        **DENISE C. JOHNSON**
        Deputy City Attorney

*Attorneys for Defendants*
**CITY OF LOS ANGELES, OFFICER CHRISTOPHER WREN, OFFICER JAMES DIAMOND**

20

## **DECLARATION OF DENISE JOHNSON**

I, DENISE JOHNSON, declare:

1.      I am an attorney at law duly admitted to practice before all courts of the State of California and before this Court.  I am a Deputy City Attorney at the Office of the City Attorney for the City of Los Angeles, Attorneys of Record for the Defendants in this action.  I make this declaration based upon my own personal knowledge and if called upon I would testify thereto.

2.      Attached hereto as Exhibit "1" is a true and correct copy of the Rule 26(a) report for plaintiffs' expert Roger Clark, supplied to Defendants by plaintiffs' counsel.

3.      Attached hereto as Exhibit "2" is a true and correct copy of certified portions of the deposition of Roger Clark dated June 9, 2009.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct and that this declaration was executed this 29th day of December, 2009 at Los Angeles, California.


/S/
_____
**DENISE C. JOHNSON**, Declarant

21

# EXHIBIT ONE

Defendants' Third
Motion in Limine

Exhibit ___1___ Page___22___

# Roger Clark

Police Procedures Consultant, Inc.
10207 Molino Road. Santee, CA 92071
Phone: (208) 351-2458, Fax: (619) 258-0045
rclark9314@aol.com
October 24, 2008

Mr. Dale K. Galipo, Attorney at Law
Law Offices of Dale K. Galipo
21800 Burbank Boulevard, Suite 310
Woodland Hills, CA 91367

Ms. Vicki I. Sarmiento, Attorney At Law
The Law Offices of Vicki Sarmiento
333 North Garfield Ave.
Alhambra, CA 91801

*Regarding:* **J.D.R., et al, v. City of Los Angeles, et al, USDC Case No. CV 06-07466 SJO. (MANx).**

Dear Ms, Sarmiento and Mr, Galipo:

Thank you for retaining me to analyze and render opinions regarding the May 11, 2005 shooting death of Bryland S. Randolph by Los Angeles Police Officer Christopher Wren and Officer James Diamond. Pursuant to the requirements of Rule 26, I have studied the reports, photographs depositions and other material provided to me regarding this case. Please be advised that as additional information develops it is possible that a supplemental report will be necessary. The information submitted thus far regarding this incident supports the following opinions:

## General Overview of Events and Opinions:

The record in this case indicates that in early May 2005, detectives obtained information from a reliable informant that marijuana was being sold from the residence at 3791 Cimarron Street (a single story duplex) in the City of Los Angeles. On May 4, 2005 Detectives met with the informant and executed a "controlled buy" of two baggies of

Page 1 of 11

Exhibit ___1___ Page _23_

marijuana at the location. Pursuant to the controlled purchase of marijuana, a search warrant was obtained for the residence on May 11, 2005.

At approximately 6:30 pm (May 11, 2005) a briefing was held for a group of assembled detectives/officers for the purpose of serving the warrant. The officers were divided into two basic teams. One team for entry into the residence for the warrant service, and the other team to be deployed as a containment around the building to prevent any escapes. Officer Christopher Wren and Officer James Diamond were among the officers assigned as members of the containment team.

At approximately 7:00 pm the officers staged for the deployment and left for the location in a convoy of vehicles. Upon arriving at the location, and while exiting their respective vehicles, the officers were observed by a male standing in the driveway of the duplex. As soon as the male saw the officers, he began to run down the driveway and into the rear yard of the location. The team was alerted "we got runners" (an indication to the team that the operation was compromised). Officer Diamond and Officer Wren who were assigned to cover the rear yard, began to immediately follow the fleeing male.

The two officers have stated that when they turned the corner of the residence and had a view of the back yard, they observed four black males running away. All but one of the males were running towards the fences enclosing the back yard, hopping/climbing over them, and running away. According to the statements of the officers, the male closest to them (Mr. Bryland Randolph), allegedly held a semi-automatic handgun in his left hand. Officer Diamond has testified that he was the first to enter the yard and when he saw the weapon shouted "gun" as a warning and drew his weapon and started to fire at Mr. Randolph. Officer Wren has testified that he was close behind Officer Diamond and also shouted "gun" and fired at Mr. Randolph. Whereupon both began shooting at Mr. Randolph as he was running away and/or hopping over a 4 foot chain-link fence along the south boundary of the rear yard.

It must be noted here that both officers have clearly stated that they shot at Mr. Randolph only during the time he was running towards the fence and/or while he was climbing over it. Both officers agree that Officer Diamond was first to fire and Officer Wren was the last to fire their respective handguns at Mr. Randolph.

However, it is documented that Mr. Randolph's body was beyond the fence and in the back yard of the adjoining property (3793 Cimarron) when he fell. Four of the eight expended cartridge cases came to rest in the rear yard of 3793 Cimarron – not in the rear yard of 3791 Cimarron as would be expected under the set of facts proffered by the shooting officers. The location of the spent cases are indicative of semi-automatic hand

Exhibit  1  Page  24

guns that were at or beyond the fence so that the ejected cartridges would land in the rear yard where Mr. Randolph fell (3793 Cimarron). This would occur if the shooting officer(s) were at, or leaning over the fence and shooting at Mr. Randolph while he was on the ground in the next yard – not from a shooting position north of the fence (as stated by the officers).

Additionally, the results from the autopsy clearly indicate that Mr. Randolph was shot while he was turned away from the officers as they shot at him. The trajectories are such that they entered in to his back and traveled forward towards the front of his body. The trajectories of the bullets also points to the fact that Mr. Randolph was shot while he was prone on the ground (as was observed by at least one witness).

I have noted that the declaration of Ms. Deborah Moorer, an eyewitness who saw the shooting from her rear door (which was approximately only 30 feet away from the shooting), is consistent with the fact that the officers fired at Mr. Randolph while he was on the ground and facing away from them and posing no threat. She also has declared that Mr. Randolph did not have a gun in his hands during any of her observations. This appears in the record as facts contrary to those proffered by Officer Diamond and Officer Wren. Clearly, any shots fired at a subject who is down and not presenting an immediate threat to life, cannot be justified by training, policy and/or law (as taught by POST).

According to the autopsy report, of the total eight rounds fired, Mr. Randolph sustained ten gunshot wounds (some were from the same bullet as it traveled through his body). Three of the ten gunshot wounds were listed as "fatal." The record indicated that Officer Diamond fired his weapon five times and Officer Wren fired three times. Exactly when they occurred in the sequence of events and when the fatal wounding occurred is, of course, a matter for a jury to determine. Sufficient to say here that I agree with the LAPD policy that each shot must be justified on its own merits. Officers are trained (and required) to make such judgement calls and hold their fire when a threat no longer exists. If shots were fired when no objectively reasonable threat existed to the officers, then any such rounds fired by them would be excessive lethal force, out-of-policy, and not authorized by law (as taught by POST).

### The Alleged Handgun Found at the Scene:

As stated above, Officers Diamond and Officer Wren testified that Mr. Randolph held a gun in his left hand when they confronted him, and therefore shot at him as an act of self defense. The existence of a handgun in these set of facts is essential to justify the shooting death of Mr. Randolph. Officers are well aware that they cannot shoot at a

Exhibit _1_ Page _25_

fleeing subject when there is no threat. The Officers were serving a warrant pursuant to the sales of marijuana. Mr. Randolph was not a named suspect in the case. He could only be viewed as a suspicious person in the back yard of a location suspected of selling marijuana. He could be legally detained and/or arrested for further investigation if necessary. But there is nothing that would justify the use of lethal force to stop his flight if he chose to run. Therefore the importance of the alleged handgun becomes a pivotal issue in justifying the use of lethal force that occurred.

I have noted that Mr. Randolph apparently had a cell telephone in his possession (recovered near his body) when he was shot. However, the officers have clearly stated that they did not mistake the cell telephone for the alleged handgun that they observed in Mr. Randolph's left hand.

The record indicates that the shooting occurred at 7:11 pm. Immediately thereafter Mr. Randolph was handcuffed and the shooting scene was secured for evaluation. Both Officer Diamond and Officer Wren allegedly provided immediate statements that Mr. Randolph had a gun in his hand when they shot him. Yet the handgun was not "discovered" in the tall grass along the base of the fence for approximately 4 to 5 hours after the shooting – during Officer Wren's walk-through hours later. Officer Wren described the discovery in his deposition as follows:

Q.      "When the walk-through was taking place at some point did someone say words to the effect, "Hey, we found a gun?""

A.      "Yes."

Q.      "How did that occur?"

A.      "I was directed to provide some information regarding the walk-through. One of the detectives had a flashlight – well we all had flashlights, by that point it was dark – and we were discussing some of the incident or what have you. And one of the detectives said, it was words to this effect, "Bingo, here it is right here." Something to that effect." (Deposition, page 52 & 53).

The fact that the alleged gun was not located for such an inordinate amount of time – well beyond anything reasonably expected under the circumstances – is a very troubling aspect of this case. Especially in view of the statements of Ms. Moorer who categorically states in her declaration that Mr. Randolph never had a gun in his hand when he was shot. I

Page 4 of 11

Exhibit____1____ Page____26

have also noted that no fingerprint analysis linked Mr. Randolph to the gun. DNA analysis was not included in the documents I reviewed.

It is a known fact in the profession and to all OIS investigators that "throw downs" or "throw aways"are used by corrupt officers to justify there otherwise illegal uses of lethal force. This is always a concern in a honest department and it is monitored by the OIS detectives. Thus, when an officer involved shooting occurs, care is taken to perform a precise investigation at the scene and in the lab. Supervisors are also keen to the issues involved, and know it is their responsibility to keep the scene secure. This includes the immediate location of key evidence, such as the alleged gun in this case. The area where it could have possibly been dropped (and allegedly eventually found) is very small. The untrimmed "tall grass" areas at the base of the fence was only inches wide. That the gun could not be located for over four hours and only after the facts of the shooting became apparent to the investigators remains as a glaring issue in this case.

### Items Studied:

1.  The Plaintiff's Complaint filed in this case.

2.  Transcription of tape recorded interview of:
    *   Officer Rodney Carter.
    *   Officer Christopher Wren.
    *   Officer James Diamond.

3.  Department Command post incident notification log.

4.  Interdepartmental correspondence (commanding officers analysis of a supervisor's response to a categorical use of force incident.

5.  Force investigational division report.

6.  Legend O.I.S.

7.  Summary Matrix.

8.  Property report.

9.  Firearms supplemental property report.

Page 5 of 11

Exhibit ___1___ Page ___27___

10. Autopsy report.

11. Medical report.

12. Toxicology report.

13. Coroner Investigator narrative.

14. Hospital and nursing care facility report.

14. Forensic Laboratory analysis report.

15. Autopsy report (supplemental).

16. Search Warrant and affidavit.

17. Tactical plan report.

18. Firearms analyzed evidence report.

19. Analyzed evidence report.

20. Preliminary Investigation report (Off. Wren).

21. Arrest report (swat).

22. Employee's report (swat).

23. K-9 deployment report.

24. Sergeant's daily report.

25. Sergeant's daily log.

26. Gang enforcement detail- supervisor's daily report.

27. Watch commander's daily report + supplemental.

28. Call for service log.

Page 6 of 11

Exhibit _____1_____ Page _____28_____

29. The deposition transcript of Officer Christopher Wren, taken February 19, 2008.

30. The deposition transcript of Officer James Diamond, taken February 19, 2008.

31. The deposition transcript of Dr. William Edward Sherry, M.D. taken September 2, 2008.

32. The deposition transcript of Dr. Ajay J. Panchal, M.D. taken September 2, 2008.

33. The deposition transcript of Rafael Garcia (Criminalist) taken September 3, 2008.

34. The Declaration of Deborah Moorer.

35. Site visit and inspection of the incident scene on October 21, 2007.

36. Arial and satellite views of the incident scene.

37. POST Learning Domain # 1, "Leadership, Professionalism, and Ethics."

38. POST Learning Domain # 2, "Criminal Justice System."

39. POST Learning Domain # 20, "Use of Force."

40 POST Training Domain # 21: "Patrol Techniques."

41. POST Learning Domain # 33, "Arrest Methods/Defensive Tactics."

42. Power point presentation provided by the defendants.

## My Qualifications for Reviewing this Case:

My opinions are based in part on my training, professional experience and education. I am a twenty-seven year veteran of the Los Angeles County Sheriffs Department (LASD). I was hired on December 1, 1965, and I retired from active service on March 31, 1993.

Exhibit____1____ Page___29

My career included six years at the rank of Deputy Sheriff, six years as a Sergeant, and fifteen years as a Lieutenant. I retired holding a California Peace Officer Standards and Training (POST) Advanced Certificate, and I am a graduate of the POST Command College (class #5).

During the course of my service with the department, I had a wide range of duties. Those duties included an 18 month assignment as a staff jail deputy and two years as an Administrator/ Lieutenant in the same jail facility (Men's Central Jail). I also served on the department as a patrol officer, field supervisor, jail watch commander and administrator, station watch commander and commanding officer of investigative units. I was a field training officer while assigned as a patrol deputy, and I trained new officers in POST and department approved patrol procedures, field investigations, apprehension techniques, and emergency procedures.

I was a Station Detective and, as such, reviewed and assessed cases passed on to me by the patrol officers. Those cases included possible complaints relating to both misdemeanor and felony crimes. They frequently required follow-up investigations and interviews before the exact nature of the case could be determined. As a field officer and detective, I was trained in interview and interrogation methods and subsequently trained other officers.

Among other assignments as a Sergeant, I supervised field officers and station detectives as they took complaints and conducted preliminary investigations regarding criminal and administrative matters.

As a Sergeant and as a Lieutenant, I served on the training staff of the Los Angeles County Sheriffs Department's Patrol School which taught the POST accepted patrol tactics, and investigation and apprehension methods.

As a Watch Commander and as a Lieutenant, I responded to, investigated, and reported on the use of force and officer involved shootings. I was also assigned by my Department to sit as a member of Departmental review committees regarding the reasonable or unreasonable use of force and tactics.

As stated above, during my career I was assigned to the Los Angeles County Men's Central Jail (MCJ) for a period of 18 months as a line officer. Upon my subsequent promotion to Lieutenant, I returned to the same facility approximately 10 years later. During that time I was assigned as a Jail Watch Commander, and as the Facility Training and Logistics Administrator. At the time of my assignment,

Exhibit __1__ Page __30__

the MCJ held a daily population in excess of 7,000 inmates, including a hospital, which was serviced by a staff of more than 900 sworn and civilian personnel.

During my assignment as the Administrative Lieutenant of the Department's Reserve Forces Bureau, I worked closely with the State of California Peace Officer Standards and Training in revamping our Reserve Academy to bring it into state compliance. This process gave me an expertise in the POST Basic curriculum. I also supervised the training of cadets at our Reserve Training Academy. They were taught proper investigation, interview, and apprehension procedures. Among other topics, I lectured the Reserve Academy on the POST syllabus: "The Legal and Moral Use of Force and Firearms."

During the last five and one-half years of my career, I commanded a specialized unit known as the North Regional Surveillance and Apprehension Team (N.O.R.S.A.T.), which was created to investigate, locate, observe and arrest major (career) criminals. I held this position until my retirement from the Department on March 31, 1993. Criminals investigated and arrested by N.O.R.S.A.T. included suspects involved with homicide, robbery, kidnaping, extortion, burglary, major narcotics violations and police corruption. The majority of our cases were homicide cases, including the murder of police officers. Arrests frequently occurred in dynamic circumstances including crimes in progress.

My unit also conducted major narcotics investigations including undercover narcotics buys, buy-busts, and reverse stings. We frequently deployed at the request of investigative units, such as Narcotics, which provided the initial investigative leads for our operations. These narcotics cases usually involved multiple kilogram quantities of drugs and amounts of money ranging from one hundred thousand to more than one million dollars.

Approximately 80% of cases assigned to N.O.R.S.A.T. were active Homicide investigations. In that regard, the unit processed under my command and supervision, various aspects (depending on the complexity of the cases involved) of approximately 1,000 Homicides ranging from deaths of police officers to serial homicide suspects. Additionally, the majority of the 380 cases for which I have been retained as a consultant (since 1993) have involved injuries or deaths connected with some aspect of force during either apprehension or while in police custody.

During the first three months of my command of N.O.R.S.A.T., the unit had three justifiable shooting incidents. From that time, and over the next five years of my command, N.O.R.S.A.T. established a remarkable record of more than two thousand

Page 9 of 11

Exhibit____1____Page____31

arrests of career criminals without a single shot fired – either by my officers or by the suspects whom we arrested.

Many of these suspects were armed and considered to be very dangerous. Some were apprehended during the course of their crimes and were very prone to use firearms to escape apprehension.

This record of excellence was accomplished through the use of proper tactics, management and supervision of personnel, training in correct apprehension methods and adherence to the moral and ethical standards endorsed by California POST and my Department. These methods and principles are also embraced by every state training commission of which I am aware, as well as the national standards established by the U.S. Department of Justice.

As a result of my position and record as the commanding officer of N.O.R.S.A.T., I was assigned to author Field Operations Directive 89-3, "Tactical Operations Involving Detective Personnel." This order remains in force today, without change, and includes the basic standards and considerations with which investigative officers must comply in the event of a tactical deployment such as the dynamic entry into a building for the purpose of an arrest and/or seizure of evidence.

Since my retirement, I have testified as an expert in both civil and criminal cases on police administration, police procedures, police tactics, police investigative procedures, basic evidence evaluation and shooting scene reconstruction, jail procedures and jail administration, in Arizona State Courts, California Courts, Washington State Courts and Federal Courts in California, Texas, Colorado, Illinois, Indiana, Pennsylvania, and Washington. I have also submitted written opinions in matters before Alaska, Idaho, Montana, North Carolina, Oregon and Wyoming Federal and State Courts.

I have testified before the Los Angles Police Department Board of Rights and the Los Angeles County Civil Service Commission. I have testified before the Harris County (Texas) Grand Jury. I was selected (January 20, 2007) to present on the Topic of "Police Experts" at the National Police Accountability Project held at Loyola Law School, Los Angeles, California. I have worked on several projects with the Paso Del Norte (El Paso, Texas) Civil Rights Project, and the Texas Civil Rights Project (Austin, Texas). I have been recognized, and my expert report was quoted by the United States Court of Appeals for the Ninth Circuit as an expert in Police Administration and Use of Force (For Publication – Gary Blankenhorn v. City of Orange, et al. No. 04-55938, D.C. No. CV-02-01160-GLT Opinion). The Ninth Circuit also drew from my expert report in a second published case involving Police Detective Investigations (For Publication – Raymond

Exhibit ___1___ Page ___32___

Torres, et al v. City of Los Angeles, et al, No. 06-55817, D.C. No. CV-05-04171-RGK Opinion).

On February 10, 1989, I was personally commended at the Los Angeles County Hall of Administration by United States Attorney, the Honorable General Edwin Meese III, for my work to establish California Penal Code Section 311.11 (forbidding the Possession of Child Pornography). On February 22, 1993 (at the time of my retirement), Mr. Meese presented a second personal commendation for the success of this critical 5 year effort to bring this law into affect.

I have been found competent by both Federal and State Courts to render opinions as to the duties and responsibilities of police officers regarding their individual and collective responsibilities as occurred in this case. A number of my cases have involved law enforcement officers as civil plaintiffs and as criminal defendants. A complete listing of my expert testimony on all matters since January 2000 is attached to this report as Exhibit C.

Please keep in mind that further reports from me may be necessary as additional depositions are taken and other reports are submitted. Attached as Exhibit A is a statement listing my law enforcement qualifications and experience; Exhibit B is my fee schedule; Exhibit C is a listing of matters in which I have testified in the last four years as an expert.

I declare under penalty of perjury that the foregoing is true and correct. Executed October 24, 2008 at Santee, California.

Roger A. Clark

Page 11 of 11

Exhibit ___1___ Page ___33___

## ROGER A. CLARK

*10207 Molino Road • Santee CA 92071 • Telephone: (208) 351-2458. Fax: (619) 258-0045.*

### EXPERIENCE

**Police Procedures Consultant (self employed)**
April 1, 1993 to Present................................................................**15 years**

I am a court certified expert in jail and police procedures in Federal and State
Courts. I select my cases carefully and have consulted in approximately 490
cases thus far since my retirement from the Los Angeles County Sheriff's
Department.

**Substitute Teacher, Madison School District**
August 1994 to 2003......................................................................... **9 years**

I substitute teach at all levels in the school district (elementary to high school).
As a volunteer, I wrote and managed a $85,000.00 federal grant for our
Central High School. This grant is in its sixth year and has generated
$510,000.00 for the school.

**District Liaison, State of Idaho Department of Juvenile Corrections**
August 1, 1995 to March 1, 1997...........................................**1 year, 7 months**

I represented the new Department of Juvenile Corrections to the ten counties
in the Seventh Judicial District. As such, I worked closely with Probation
Officers, County Commissioners, Judges, other state agencies, private care
providers, etc. in the implementation of the new Idaho Juvenile Corrections
Act of 1995. I wrote or participated in the writing of several federal grants for
the District. I conducted training - both formal and informal - and developed a
series of new therapy programs for juveniles with private care providers. I
also served as the Director of the Detention Center and the State Placement
Coordinator during this time.

-1-

Exhibit ____1____ Page ___34___

**Los Angeles County Sheriff's Department**
December 1, 1965 to March 31, 1993................................27 years 4 months

**Note:** In 1993 the Los Angeles County Sheriff's Department had 7,000 sworn and 3,000 civilian personnel and a daily County Jail inmate population of 23,000.

**Service as a Lieutenant (15 Years, 0 Months):**

**1. Field Operations Region I**
  **NORSAT**                          11/15/87 to 3/31/93   64 months

I commanded a specialized unit created to investigate, locate, observe and arrest major (career) criminal offenders. This unit was designed as a multijurisdictional effort for the cities in the northern region of Los Angeles County. The command consisted of four (4) Sergeants, seventeen (17) Deputies, four (4) Police Officers, twenty five (25) Reserves, and three (3) civilian employees. The 1992 budget set at $1.5 million. The arrest rate averaged 500 career criminal arrests per year with a 97% conviction rate and no shots fired (on either side) for 61 consecutive months.

Significant contributions while assigned at this Bureau were:

- •    Increase in participating police agencies.
- •    Direct participation with corporate (private) agencies.
- •    Formation of a reserve and volunteer unit.
- •    Establishment of NORSAT Foundation private funding.
- •    Computerization of the unit.
- •    Promotion of fourteen personnel.
- •    Fleet expansion from 13 to 28 vehicles (donated).
- •    Formation of the DEA Valley Task Force.
- •    Field Operations Directive 89-3.

**2.    Executive Offices**
  **Reserve Forces Bureau**          05/01/84 to 11/15/87  42 months

I was the administrative officer to a specialized bureau responsible for coordinating the activities of 1,000 sworn reserve personnel, 900 civilian

-2-

Exhibit ____1____ Page ___35___

volunteers, and 450 law enforcement explorer scouts. The Bureau identifies programs for their effective utilization throughout the Department; develops and tracks training programs; sponsors activities designed to promote growth and keep morale at high levels.

Significant contributions while assigned at this bureau are:

- Total restructure of the Academy training process for reserve Deputies.
- Implementation of upgrade programs to move lower level reserves to level I status.
- Departmental Reserve Certification procedures.
- Annual leadership seminar.
- The Reserve News, a nationally recognized police magazine.
- Computerization of the Bureau.

### 3. Field Operations Region I
**Crescenta Valley Station** 04/01/80 to 05/01/84 **49 months**

Crescenta Valley Station is a full service police facility of 100 personnel serving a population of 50,000 (including the Contract City of La Canada-Flintridge) and a total area of 250 square miles. During my four years service at this facility I served in every management role:

- **Nine months** as the Station Commander during an extended absence by the Captain (08/01/83 TO 05/01/84).
- **Sixteen months** as the Operations Lieutenant (03/01/82 TO 08/01/83).
- **Twelve months** as the station Detective Bureau Commander (03/01/81 to 01/01/82).
- **Twelve months** as a Watch Commander (04/01/80 to 03/01/81).

Significant contributions while assigned at this command are:

- Negotiation of an enhanced city contract (at a savings to the City).
- Formation of a volunteer community support group.
- Development and implementation of an integrated community emergency response plan.
- High School undercover narcotics operation.
- Restructure of the Station Detective Bureau.
- The annual station picnic, which was effective in boosting station morale.

-3-

Exhibit ___1___ Page ___36___

4.    **Custody Division**
      **Central Jail**              04/01/78 to 04/01/80  **24 months**

The Los Angeles County Central Jail is the largest jail facility in the State of
California, with a daily inmate population of seven thousand (7,000), an
assigned staff of six hundred (600), and two hundred (200) civilian personnel.
My service at this command was equally divided into two major assignments:

- Training and Logistics Lieutenant (04/01/79 to 04/01/80).
- Watch Commander (04/01/78 to 04/01/79).

Significant contributions while assigned at this command are:

- "Hot Fire" Training program, which is now a State (POST) mandated
  training module for all custody personnel throughout California.
- The "Defend in Place" fire safety operational plan for jail facilities.
- New fire safety specifications for jail bedding and mattresses.
- The development of fire safe jail mattress material.
- The development of a facility emergency response plan.
- The computerization of training, timekeeping, and scheduling for the
  facility (800 sworn and 200 civilian personnel).
- "Spouse day at CJ"--A program for spouses of employees.


**Service as a Sergeant (6 Years, 4 Months):**


5.    **Administrative Division**
      **Federal Surplus Property**   01/12/76 to 04/01/78  **27 months**

This program was entirely my idea and developed while I was assigned at my
previous assignment (Emergency Operations Bureau). The unit provides
millions of dollars in free federal excess and surplus food and property from
clothing to heavy equipment and aircraft to the department each year. I am
very proud of this contribution to the Department.


6.    **Patrol Division**
      **Emergency Operations**    02/01/74 to 01/12/76  **23 months**

I was among the original personnel that formed this unit which blended the
activities of the Department's planning    unit with emergency operations
planning and preparation. I was assigned as the Personnel and Logistics
Sergeant.

-4-

Exhibit____1____Page____37

Significant contributions while assigned at this command are:

- Formation of a new County Emergency Operations Center.
- Participation in the 1974 Federal earthquake studies of Los Angeles County.
- Development of the Department's specialized Field Command Post equipment.
- Development of the Department's Field Booking Team.

7.   **Patrol Division**
     **Civil Defense Bureau**     12/01/73 to 02/01/74  **02 months**

I was assigned to this unit to facilitate the orderly transition into the new Emergency Operations Bureau.

8.   **Patrol Division**
     **San Dimas Station**     12/12/72 to 12/01/73  **12 months**

I performed all the duties of a Watch and Patrol Sergeant. I also frequently served as the Watch Commander.

9.   **Technical Serviced Division**
     **Communications Bureau**     12/01/71 to 12/12/72  **12 months**

I served as the Watch Commander in The Sheriff's Department's old radio room located at the Hall of Justice, and assisted in the transition to the existing communications facility.

**Service as a Deputy (6 Years, 0 Months):**

10.   **Patrol Division**
      **San Dimas Station**
      **Detective Bureau**     01/01/70 to 12/01/71  **23 months**

I served as a Station Detective assigned to the evening watch. I handled the first response to all crimes requiring investigations. I processed all evening juvenile matters, prepared criminal complaints and juvenile petitions.

-5-

11. **Patrol Division**
    **San Dimas Station Patrol**   01/29/68 to 01/01/70 **24 months**

I performed all duties assigned to Station Patrol: Jailer, Desk, Watch Deputy,
Patrol, and Traffic.

12. **Technical Services Division**
    **Transportation Bureau**   11/01/67 to 01/29/68 **02 months**

I was temporarily assigned to the Beverly Hills Municipal Court pending my
assignment to a Patrol Station.

13. **Custody Division**
    **Central Jail**   05/06/66 to 11/01/67 **18 months**

I returned to my previous assignment at the Central Jail after graduation from the
Academy. I performed all aspects of a Custody Deputy i.e. Module Officer,
Prowler, Control Booth, High Power, etc.

14. **Administrative Division**
    **Academy**   01/17/66 to 05/06/66 **04 months**

I was a Sheriff's trainee assigned to Class #110.

15. **Custody Division**
    **Central Jail**   12/01/65 to 01/17/66 **01 month**

I was a pre-academy Custody Deputy assigned to the Central Jail as an "off the
street" Deputy Sheriff.

## DEGREES AND CERTIFICATION

| | | |
|---|---|---|
| P.O.S.T. Command College (Class #5) | POST | 1988 |
| Management Certification | POST | 1980 |
| Advanced Certification | POST | 1975 |
| Associate of Science Degree | Chaffey College | 1971 |

-6-

Exhibit____1____ Page__39__

# EXHIBIT TWO

Defendants' Third
Motion in Limine

Exhibit _2_ Page _40_

CERTIFIED COPY

## UNITED STATES DISTRICT COURT FOR THE

## CENTRAL DISTRICT OF CALIFORNIA

J.D.R., ET AL.,                          )
                                         )
                  PLAINTIFFS,            )
                                         )
         V.                              )   NO. CV-06-07466 VBF (MANx)
                                         )
CITY OF LOS ANGELES, ET AL.,             )
                                         )
                  DEFENDANTS.            )
_____  )

# DEPOSITION OF ROGER A. CLARK

# JUNE 9, 2009

REPORTED BY
WENDY SOBEL
CSR. NO. 2341
JOB NO. 09AE460-WS



COURT REPORTERS

515 S. Flower Street
Suite 3600
Los Angeles, California 90071
Office: (213) 955-0070
Fax: (213) 955-0077

Exhibit  2  Page  41

```
 1    investigative procedures.

 2         Q    So the use of force goes along with police

 3    practices and use of force --

 4         A    Correct.

 5         Q    -- inappropriate force?

 6         A    Yes.

 7         Q    And then you said investigative procedures.

 8              Would you explain that for me?

 9         A    Well, as you know from my report I comment

10    somewhat on the investigation that occurred, some of the

11    deficiencies.

12         Q    And by that you're referring to on the part of

13    the OIS detectives?

14         A    Correct.

15         Q    When were you retained, if you recall?

16         A    In September of last year.

17         Q    So '08?

18         A    '08.  Formally October 9th and I have the

19    correspondence of last year.  I talked to Dale about this

20    case, I think, several months prior just informally.

21         Q    What was your assignment with respect to this

22    case?

23         A    As always, just to review the material and

24    render an opinion upon my review.  You know, it's a

25    troubling -- there's some troubling aspects as I list out
```

6

Exhibit __2__  Page __42__

1      A    Unless they're in that document, no, the

2  answer's no.

3      Q    And you did not review a Rule 26 report by

4  Dr. Lewinski?

5      A    No.

6      Q    And then other than the officers' FID

7  statements that I listed, you have not reviewed any other

8  FID statements by any other witnesses.  Correct?

9      A    Correct.

10     Q    Moving on.  Other than the version that you

11 submitted, the version of your Rule 26 report that we've

12 marked as Exhibit 1, were there any other drafts or

13 versions or editions?

14     A    There are not.

15     Q    Going to -- actually, let me start back here.

16          I reviewed your report and I sort of tried to

17 summarize what your opinions were that I could glean from

18 the report.  So I want to kind of go through them and

19 then ask you if there are any other opinions that I

20 missed other than these that I'm listing.

21          So it appears your first opinion is that the

22 suspect, you believe the suspect -- and when I say

23 suspect I mean Brayland Randolph -- did not have a gun.

24     A    I do.  But that's an issue obviously for the

25 jury to determine.  But I personally do not believe he

14

1    had a gun.

2         Q    Also, you seem to hint that you believe the gun

3    that was found at the scene was planted?

4         A    Well, that's a very dark possibility.

5         Q    Is that your opinion?

6         A    I think that if he was not armed then the

7    explanation of how the gun got there, there's a variety

8    of explanations but...

9         Q    I just want to find out what your opinion is on

10   this case.

11        A    Yes.

12        Q    And you believe he did not have a gun?

13        A    I believe he did not have a gun in his hand

14   when he was shot.  Let me say that.  I can embrace other

15   possibilities.

16        Q    Do you believe he might have had a gun in his

17   hand before he was shot?

18        A    I would say that would be a possibility and it

19   would be more of a possibility if the DNA could connect

20   him or some other physical evidence could connect him to

21   the gun.  In this case what bothers me a lot is there's

22   no scientific connection between him and the gun and

23   there's nothing in the investigative file connecting him

24   to a gun other than it being seen in his hand at the time

25   of shooting.  So I just leave it at that.

15

Exhibit  2   Page  44

1     Q   But you would agree that you can't necessarily

2  conclude that the gun was clean without an analysis?

3     A   Right.

4     Q   Nor can you conclude it had DNA on it?

5     A   Right.

6     Q   So --

7     A   Let me just put an aside here.  If it was

8  linked DNA-wise to him it would have been in the reports,

9  I'm sure.  I'm sure that would not be kept quiet.

10     Q   Probably not.

11       So your opinion was the suspect did not have a

12  gun when he was shot?

13     A   My personal belief, you need to say that

14  because I don't believe that has an issue -- I think

15  there's substantial evidence that the jury will consider

16  whether or not he was armed.

17     Q   So in terms of your assignment or your

18  retention as a police practices expert in this case,

19  that's not one of your professional opinions, that's more

20  of a personal caveat.  Correct?

21     A   Right.

22     Q   So you don't really have an opinion whether or

23  not he had the gun at the time he was shot?

24     A   Correct.

25     Q   So then would it be fair to say that your

18

Exhibit _2_ Page _45_

1  personal opinion that the gun may or may not have been

2  planted is also not something related to your

3  professional opinions in this case?

4       A    Correct.

5       Q    So we can save time and dispel this.

6            Is it your opinion that Officers Wren and

7  Diamond shot Randolph while he was on the ground face

8  down on the other side of the fence from where they

9  originally saw him?

10      A    I think I can -- I'm qualified to say yes on

11 that one.  I believe that occurred.

12      Q    What do you base that opinion on?

13      A    The shell casings found on the other side of

14 the fence.  Their location -- I believe even the computer

15 analysis shows that occurred, or that it was likely that

16 it occurred.  And the trajectories speak to Randolph

17 being bent forward, consistent with being down.  And the

18 trajectories would match, a number of them through his

19 body as he was down.

20      Q    Let me start with the casings because you

21 mentioned them first.

22      A    Sure.

23      Q    You indicate in your report that four of the

24 eight casings were on the opposite, the far side of the

25 fence?

19

Exhibit 2 Page 46

1     forward, not to the rear.

2             And that -- and so if the officer is pointing

3     his gun down, and in this case it would be logically at

4     Randolph, then whatever bullet he fires the case is going

5     to eject forward of his position.  That is a very logical

6     explanation of 31.  I think that's the most likely

7     explanation of how 31 gets there.

8             Item number 32 gets there, which is a case

9     fired by Wren, for example, because they are south of the

10    fence lining.  So it speaks to several realities and I

11    think it's going to be explained by ballistics experts to

12    the jury, not -- unless I'm allowed to say something

13    about it.

14        Q    But you would agree you're not a ballistics

15    expert?

16        A    Right.  And I've said that many times.  In

17    terms of scientific analysis, but I'm -- I've been to a

18    lot of shooting scenes and I know how the fundamental

19    investigator would view this scene.  And that is that the

20    muzzle was pointed downward and that caused the case to

21    eject forward.

22        Q    So essentially what you've done is you've taken

23    Mr. Trahin's diagram of the bullet casings that were

24    found at the scene and based on your background and your

25    experience you've analyzed that location and come up with

Exhibit___2___ Page___47___

1    what you think is a plausible explanation for how the

2    casings ended up where they are.

3        A    The term plausible, it's more likely than not

4    in my opinion.  So when you ask me about an opinion that

5    would be my -- I believe my opinion based on my

6    experience and my evaluation of numerous shooting scenes.

7    And I would be surprised if there's any other logical

8    explanation to that.

9        Q    What type of firearm did Officer Diamond use?

10       A    He has a 45-caliber semiautomatic.  I forget

11   the model exactly.  It's in the reports.

12       Q    What was Officer Wren using?

13       A    He also had a 45-caliber automatic,

14   semiautomatic handgun.

15       Q    As you sit here today you don't recall the make

16   and model?

17       A    No, because even among the same makes the

18   characteristics of how the cartridge ejects has a lot to

19   do with the ammunition and even among the ammunition

20   there's going to be some differences.

21            So you can only get, and it's accepted by I

22   believe almost everyone that does look at shootings, is

23   that there's a general pattern, not precision within

24   inches or even sometimes feet, of where these casings are

25   going to land.

24

Exhibit___2___Page___48

1          Q      Have you conducted yourself an ejection pattern

2    test on either officer's firearm?

3          A      No.  I'd have to have the forearm of course and

4    the ammunition and do a substantial amount of testing.

5          Q      And you haven't seen the documentation of the

6    actual ejection pattern testing that was done on these

7    firearms?

8          A      No.

9          Q      You haven't seen the video of the fire ejection

10   testings?

11         A      Not for these weapons, no.

12         Q      If, in fact, I represented to you that in those

13   testings it did show another explanation for how these

14   casings would end up on the other side of the fence,

15   given that the officers' positions as they stated them to

16   be were accurate, would that change your opinion?

17         A      It would be something I would consider

18   certainly.

19         Q      Would it be something you'd want to look at in

20   terms of finalizing or possibly improving your opinion?

21         A      If it's there I'd like to see it.

22         Q      You've talked about the bullet casings.  Did

23   you conduct any type of trajectory analysis where you

24   went to the scene, took measurements, did the

25   calculations, anything to that effect?

25

Exhibit   2   Page   49

1        A    No.  And as you know I went to the scene and I

2   looked at it just to get the sense of the landscape but I

3   did not do any of that because I did not have all of the

4   data and I was never asked to do that.

5        Q    You would agree that, at least as it pertains

6   to this case, you're not putting yourself out as a

7   trajectory expert?

8        A    No.

9        Q    You don't agree or you do agree?

10       A    I do agree with you, I am not.

11       Q    Would you also agree that you're not intending

12  to testify in this case as a wound ballistics expert?

13       A    No.  I take the autopsy report on face value.

14       Q    Because you yourself are not a pathologist.

15            Correct?

16       A    Correct.

17       Q    Now, your opinion that Mr. Randolph was on the

18  ground on the opposite, the south side of the fence face

19  down when he was shot, is it your opinion that he was in

20  that position for all of the shots or some of the shots?

21       A    I believe some of the shots is what's

22  reasonable, a reasonable assumption.

23       Q    Is it your opinion that he could have been on

24  the north side of the fence or in the process of going

25  over the fence when he was shot, as well?

26

1      A    On all the shots?

2      Q    Some of the shots.

3      A    Yes, that's possible.

4      Q    Now, your opinion that he was on the south side

5  of the fence face down on the ground when at least some

6  of the shots were fired, you mentioned that was based

7  upon the location of the casings, some of the casings

8  being on the south side of the fence.  Correct?

9      A    Yes.

10     Q    And what else?

11     A    Passage of the bullets through his body, which

12  angle in such a way that he's either pitched forward or

13  he's down on the ground and the officer's standing, the

14  angle would accommodate the angle of entry into his body.

15     Q    Wouldn't you agree, though, that that type of

16  analysis is something left to a wound ballistics expert?

17     A    Yes.

18     Q    Was there anything else that you based this

19  particular opinion on?

20     A    No.

21     Q    Now, reviewing your report it also --

22     A    I think something just came to mind.  I have

23  also considered Ms. Moorer's declaration.

24     Q    Okay.

25     A    So -- but that speaks I think generally as to

27

Exhibit__2__Page__51

```
 1              As you sit here today -- well, actually, strike
 2    that.
 3              Prior to being retained on this case you would
 4    never come in contact with Officer Christopher Wren.
 5              Correct?
 6        A     Correct.
 7        Q     Or Officer James Diamond?
 8        A     That's true.
 9        Q     So you have no information that either officer
10    has a history of corruption.  Correct?
11        A     That's right, I don't.
12        Q     Or that either officer is a discipline problem?
13        A     Right.  I have no information.
14        Q     All you know about either officer is based on
15    the materials you reviewed in this case.  Correct?
16        A     Yes.
17        Q     So you have, other than what you've reviewed in
18    these materials, no basis for believing that either one
19    of these officers should have been terminated or should
20    have been disciplined prior to this incident?
21        A     Prior?
22        Q     Yes.
23        A     No.
24        Q     Now, other than your personal opinion that it's
25    possible that members of the OIS investigation team, OIS
```

                                                          35

1    meaning Officer Involved Shooting, could have planted a

2    firearm at the scene of this incident, you have no

3    evidence to base that on.  Correct?

4        MR. FATTAHI:  Objection, misstates testimony.

5        THE WITNESS:  I have no evidence that that occurred.

6        Q    BY MS. JOHNSON:  So essentially you're

7    speculating?

8        A    Based on what's before me it's an educated

9    speculation.  It's actually, if I believed to the

10   contrary I would not have taken this case, it would have

11   been a turn down.  And I have many, many times turned

12   down such cases.  There's some really dark and troubling

13   issues and that's why I took the case.

14       Q    Have you ever testified at deposition or at

15   trial that an officer who was involved in a shooting, an

16   on-duty shooting, was justified in the shooting?

17       A    Oh, yes.

18       Q    What case?

19       A    It's -- well, let me tell you about the case

20   and maybe the name will come up.  It was a Los Angeles

21   County Sheriff's case.  This is one that comes to mind,

22   where I took the case because it was negligence in the

23   supervision in the command structure but the officers

24   were placed in a situation that was a gentleman who had

25   gone to a fight with his wife, he got cornered on a porch

                                                    36

A&E COURT REPORTERS (213) 955-0070 FAX: (213) 955-0077

Exhibit  2   Page  53

1    regarding this case other than that?

2         A    Well, sure.  I mean -- the -- and I don't know

3    if I clearly understand the question but just like a lot

4    of tragedies it's not just one single aspect or incident,

5    although there are these pivotal moments but it's usually

6    a sequence.

7         Q    But what I'm trying to find out is you are the

8    police practices expert for the plaintiff and you

9    indicated at the beginning of this deposition that it was

10   your job to point out improper police tactics that were

11   employed or improper police conduct.

12        A    Right.

13        Q    Other than it's your opinion that they shot

14   Brayland Randolph face down on the ground and that was

15   improper, do you have any other opinions regarding

16   improper conduct of the shooting officers or any other

17   officers?

18        A    I'm glad you said any other officers because

19   the commanding officer of the event was -- certainly

20   demonstrated an incompetence in the way and the method

21   that this takedown of the location was going to occur.

22        Q    What do you mean, the warrant?

23        A    Yeah, how they were going to execute the

24   warrant and as you know I have -- in my resume I've

25   listed that I've had five and a half years of experience

41

Exhibit __2__ Page __54__

1    with this kind of operation.

2          It has -- the deployment has to be weighed

3    against the crime itself.  This is a buy into a location

4    that provided marijuana, not heroin, not cocaine, that

5    lessens somewhat the type of crime that they're going to

6    investigate and abate.

7          And they apparently started the deployment far

8    too soon before the back containment could be set and

9    announced via the communications.  I realize that there

10   was -- they said that they were burned by an outside

11   observer who saw them coming.

12         I see nothing in the reports about what I would

13   consider necessary, such as the secondary containment

14   because the -- this was a deployment that the division

15   would know about, all the officers in the area would be

16   aware was going to occur.

17         And that there would have been a uniformed --

18   what we call a secondary containment.  So that if there

19   were fleeing suspects they would be picked up.  And they

20   broke the primary containment, which would be the crew,

21   part of it, that half crew that set the primary

22   containment up.  If they slipped through that or got

23   through it that they would be picked up by the secondary

24   containment.

25         I was surprised that -- and I don't know how

42

Exhibit___2___Page___55___

1    busy it was, the arrow unit was onboard and up.  The

2    secondary containment typically besides uniformed

3    officers, canine, they're ready to -- they're primed for

4    fleeing suspect on foot.

5         Having said that, we have at the very beginning

6    of stages some sequence that I believe the incident

7    commander should have aborted.  We have a dropped radio

8    and a fire extinguisher that a guy can't extract.  So two

9    guys by themselves out of the primary containment go to

10   the back.  In other words, they've split the team and at

11   least half the team's not with them.

12       Q    You think that's the commanding officer's

13   fault?

14       A    Yes.  When they say, you know, we're

15   compromised and as you know it says -- compromise

16   compromise compromise is put out over the air.  Here's

17   what's the problem, if you're going to kick a door down

18   and they're aware of you, you're not catching anybody by

19   surprise.  I could talk for a while about the whole idea

20   of doing that but I'm not going to criticize them

21   deciding they're going to do what we call crisis entry.

22       But once you're discovered, and they're going

23   for -- the possibility exists they're going for weapons,

24   you're pretty stupid going into a location for marijuana.

25   You're going to call them out is what you're going to do.

43

Exhibit___2__ Page___56__

```
 1    You're just going to seal it off and call them out.
 2         Q    But if they're running from the back of the
 3    house into the backyard, don't you need to get officers
 4    there as quick as you can?
 5         A    This is why we have a secondary containment.
 6    Because if they're not in position or they get by them,
 7    you're not going to shoot somebody running from a house
 8    where marijuana is sold, obviously.
 9         Q    Unless they have a gun?
10         A    Unless they have a gun and they're pointing it
11    at you.  Lots of times you don't shoot people even when
12    they have guns in their hands when they're running away
13    from you.
14         Q    But sometimes you do?
15         A    Sometimes you do.
16         Q    And you agree that --
17         A    There are rules.  It's called imminent threat,
18    okay?
19         Q    Let me ask you this on that note.
20         A    Okay.  So I'm stopping my commentary.
21         Q    Just for a second, yes.
22              Someone points a gun at you and stops pointing
23    it long enough to jump a fence, isn't it still okay to
24    shoot them?
25         A    If they point the gun -- while they're pointing
```

44

Exhibit 2 Page 57

1    daylight when it occurred.

2         Q     So you would agree that those facts could

3    present challenges in finding the gun.  Given that the

4    suspect as shown in Exhibit 2 was actually several feet

5    from the chain-link fence when he was treated by

6    paramedics?

7         A     Yes.

8         Q     You would agree, wouldn't you, the fact that

9    OIS detectives couldn't find the gun for some time cannot

10   be attributed to Officers Wren and Diamond?

11        A     Yes.

12        Q     And you yourself have seen the photos of where

13   the gun was located?

14        A     Yes.

15        Q     Would you agree that in those photos it is

16   somewhat challenging to see it laying there in the grass?

17        A     Yes.

18        MS. JOHNSON:   Would you mind if we took a quick

19   break?

20        THE WITNESS:   That's exactly what I was going to ask

21   for.

22        MS. JOHNSON:   We can go off the record.

23             (Short recess taken.)

24        MS. JOHNSON:   Back on the record.

25        Q     I don't have too much more for you.

49

Exhibit ___2___ Page ___56___

```
 1              Just real quick I want to jump back to the DNA
 2     analysis.  There was not, as far as you know there was
 3     not a DNA analysis done on the firearm recovered from the
 4     scene.  Correct?
 5          A    That's exactly why I'm going through Salseda's
 6     depo right now as we speak because I considered it and I
 7     know that's where I got the information that there was
 8     no -- according to him in his depo there was no DNA
 9     analysis done.
10          Q    Okay.  For the record, I'm not aware of one,
11     either but any way I'm not trying to mislead you.
12              There is no legal requirement, is there, for a
13     department to do a DNA analysis?
14          A    Oh, goodness.  I never thought of it that way.
15     I think -- I suppose not.  But I think it's implicit with
16     ethics of the profession.
17          Q    Well, can you show me either in POST Learning
18     Domains or some kind of manual that says the department
19     is ethically required to do a DNA analysis of a suspect's
20     firearm?
21          A    Let me put it this way, and it's in the first
22     chapter of your own manual -- and one of the things I
23     like about the LAPD manual is it refers to Sir Robert
24     Peel, the Nine Principles of Policing.
25              And one of the principles is the success of the
```

                                                              50

1    will produce it at any and all court proceedings or upon

2    request by defense counsel or by the court;

3         Should the original be lost, stolen, damaged or

4    otherwise unavailable then an unsigned, certified copy

5    may be used in its place for all purposes.

6         MR. FATTAHI:  So stipulated.

7         MS. JOHNSON:  Thank you again, Mr. Clark.

8

9              (Ending time 3:25 p.m.)

10

11         (Defendant's Exhibits 1 through 3 were

12         marked for identification and are attached

13         hereto.)

14

15

16              -o0o-

17

18         I declare under penalty of perjury that

19    the foregoing is true and correct.

20         Executed this _____ day of _____,

21    2009, at _____, California.

22

23         _____

                  Roger A. Clark

24

25

```
 1              STATE OF CALIFORNIA      )

                                         )   SS.

 2              COUNTY OF LOS ANGELES    )

 3

 4

 5              I, WENDY SOBEL, CSR NO. 2341, A DEPOSITION

 6       NOTARY IN AND FOR THE STATE OF CALIFORNIA, DO HEREBY

 7       CERTIFY:

 8              THAT, PRIOR TO BEING EXAMINED, THE WITNESS

 9       WHOSE DEPOSITION APPEARS HEREINBEFORE WAS DULY SWORN

10       TO TESTIFY THE TRUTH, THE WHOLE TRUTH, AND NOTHING

11       BUT THE TRUTH;

12              THAT THE TESTIMONY OF THE WITNESS AND ALL

13       OBJECTIONS MADE AT THE TIME OF THE EXAMINATION WERE

14       RECORDED STENOGRAPHICALLY BY ME;

15              THAT THE FOREGOING TRANSCRIPT IS A TRUE

16       RECORD OF THE TESTIMONY AND ALL OBJECTIONS MADE AT

17       THE TIME OF THE EXAMINATION.

18              I FURTHER CERTIFY THAT I AM NOT INTERESTED

19       IN THE OUTCOME OF THE ACTION.

20              IN WITNESS WHEREOF, I HAVE HEREUNTO

21       SUBSCRIBED MY NAME THIS 1ST DAY OF JULY, 2009.

22

23                         Wendy Sobel

                               WENDY SOBEL

24

25
```

70

Exhibit  2  Page  61