**CARMEN A. TRUTANICH**, City Attorney
**MICHAEL CLAESSENS**, Senior Assistant City Attorney
**CORY M. BRENTE,** Supervising Assistant City Attorney
**DENISE C. JOHNSON,** Deputy City Attorney - (SBN191992)
200 North Main Street, 6th Floor, City Hall East
Los Angeles, California  90012
Email: denise.johnson@lacity.org
Phone No.: (213) 978-7032, Fax No.: (213) 978-8785

*Attorneys for Defendants* **CITY OF LOS ANGELES,
OFFICER CHRISTOPHER WREN and OFFICER JAMES DIAMOND**

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| J.D.R, et al.,<br><br>　　　　　*Plaintiffs,*<br><br>　vs.<br><br>CITY OF LOS ANGELES, OFFICER CHRISTOPHER WREN, OFFICER JAMES DIAMOND, and DOES 1 through 10, inclusive,<br><br>　　　　　*Defendants*. | Case No.: CV06-07466 VBF (MANx)<br>*Complaint Filed: 11/21/06*<br><br>**DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW**<br><br>**PTC Date:　　January 21, 2010**<br>**TRIAL Date:　February 9, 2010**<br>**PLACE:　　　Courtroom 9**<br><br>**U.S. District Judge**<br>**Valerie Baker Fairbank** |

Defendant**s CITY OF LOS ANGELES, OFFICER CHRISTOPHER WREN and OFFICER JAMES DIAMOND** hereby submit their Memorandum of Contentions of Fact and Law in accordance with this Courts order dated January 4, 2010 and Local Rule 16-4 et seq.

///
///
///
///
///

1

**CONTENTIONS OF FACT**

1. On May 11, 2005 decedent Brayland Randolph fled a house when police officers from the Los Angeles Police Department (hereafter LAPD) attempted to serve a search warrant upon the house for suspected narcotics activity.

2. Officers Christopher Wren and James Diamond ran to the back of the house when the presence of the officers became known to the inhabitants of the house who subsequently ran out the back door. Officers Wren and Diamond saw Randolph attempting to run from them as they reached the backyard of the house.

3. Realizing that the police had caught up to him, Randolph pointed a loaded .380 caliber semi-automatic handgun at both officers as he attempted to flee the scene.

4. Seeing the handgun pointed at them, both officers fired upon Brayland Randolph in defense of their lives.

5. Randolph sustained multiple gunshot wounds as he was attempted to jump over a four-foot high chain link fence. He collapsed on the other side of the fence and succumbed to his injuries.

**CONTENTIONS OF LAW**

**I.   CLAIMS AND DEFENSES**

  **(a)   Plaintiffs' Claims**

  Claim 1:   Officers Wren and Diamond used excessive force against decedent Brayland Randolph in violation of the 4th Amendment.

  Claim 2:   Officers Wren and Diamond battered decedent Brayland Randolph when they shot him.

  Claim 3:   Officers Wren and Diamond negligently shot decedent Brayland Randolph.

  **(b)   Elements required to prove Plaintiffs' Claims**

  For Claim 1:   Officers Wren and Diamond (1) acted under color of state law; (2) used excessive force against Brayland Randolph in violation of his constitutional right to be free from unreasonable seizure; (3) the force used

1

caused Randolph's injury.

<u>For Claim 2:</u>     Officers Wren and Diamond used unreasonable force against decedent Brayland Randolph when they shot him and that force used caused harm.

<u>For Claim 3:</u>     Officers Wren and Diamond failed to use reasonable care to prevent harm to decedent Brayland Randolph by shooting him, and that failure caused harm.

**(c)     Evidence in Opposition to Plaintiff's Claims**

<u>Claim 1:</u>     <u>Excessive Force - 4th Amendment</u>

1.     Brayland Randolph pointed a loaded handgun at them as he attempted to flee the police.

2.     Officers Wren and Diamond reasonably perceived the threat of death or serious bodily injury to themselves or any other police officers running up behind them when they saw Randolph point the handgun at them.

3.     The Defendant officers were permitted to use deadly force to defend themselves against the threat of death or serious bodily injury created by decedent Brayland Randolph when he pointed a gun at them.

4.     Officer Wren fired three rounds, and Officer Diamond fired five rounds as Randolph ran towards and jumped over a four-foot high chain link fence.

5.     All rounds were fired rapidly and within 1 ½ to 2 seconds. Randolph was not shot while he was face down on the ground.

6.     Randolph's firearm was recovered at the base of the fence he jumped over and matched the description given by Officers Wren and Diamond.

<u>Claim 2:</u>     <u>Battery</u>

1.     Brayland Randolph pointed a loaded handgun at them as he attempted to flee the police.

2.     Officers Wren and Diamond reasonably perceived the threat of death or serious bodily injury to themselves or any other police officers running up behind

2

them when they saw Randolph point the handgun at them.

3.  The Defendant officers were permitted to use deadly force to defend themselves against the threat of death or serious bodily injury created by decedent Brayland Randolph when he pointed a gun at them.

4.  Officer Wren fired three rounds, and Officer Diamond fired five rounds as Randolph ran towards and jumped over a four-foot high chain link fence.

5.  All rounds were fired rapidly and within 1 ½ to 2 seconds. Randolph was not shot while he was face down on the ground.

6.  Randolph's firearm was recovered at the base of the fence he jumped over and matched the description given by Officers Wren and Diamond.

Claim 3:   Negligence

1.  LAPD Officers were commencing the service of a search warrant at a house where narcotics activity was taking place.  The officers were serving a valid search warrant which permitted them to detain anyone who attempted to flee the premises at the time the warrant was served.

2.  An unknown suspect detected the presence of the officers and compromised the service of the warrant by alerting person s inside the home as to the officers presence.  Suspects within the house attempted to flee out the back door to evade detention/arrest.

3.  Brayland Randolph was the last suspect to run out the back door of the house in an attempt to avoid arrest by the police.

4.  As Officers Wren and Diamond reached the backyard area, they saw Randolph running away from them, pointing a loaded firearm at them.

5.  Officers Wren and Diamond reasonably perceived the threat of death or serious bodily injury to themselves or any other police officers running up behind them when they saw Randolph point the handgun at them.

6.  The Defendant officers were permitted to use deadly force to defend themselves against the threat of death or serious bodily injury created by decedent

3

Brayland Randolph when he pointed a gun at them.

7.  Officer Wren fired three rounds, and Officer Diamond fired five rounds as Randolph ran towards and jumped over a four-foot high chain link fence.

8.  All rounds were fired rapidly and within 1 ½ to 2 seconds. Randolph was not shot while he was face down on the ground.

9.  Randolph's firearm was recovered at the base of the fence he jumped over and matched the description given by Officers Wren and Diamond.

**(d)  Defendants affirmative defenses**

First Affirmative Defense:   The Officers Are Entitled to Qualified Immunity.

Second Affirmative Defense:  Brayland Randolph was negligent and his negligence caused his injury.

Third Affirmative Defense:   California Penal Code section 196 permits Officers Wren and Diamond to use deadly force under these circumstances as justifiable homicide.

**(e)  Elements Establishing Affirmative Defenses**

First Affirmative Defense:   The officers are entitled to qualified immunity.

Defendants are immune from liability under the defense of qualified immunity: A police officer defendant is entitled to the protections of qualified immunity from all constitutional claims. Manley v. Briggs, 475 U.S. 335 (1986); Hallstrom v. Garden City, 991 F. 2d 1473, 1483 (9th Cir. 1993); Saucier v. Katz, 533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001).  See also; U.S. v. Arrizu, No. 00-1519, 2002 U.S. Lexis 490 (Jan. 15, 2002). In determining whether the individual defendant officers are subject to suit based upon plaintiffs' federal claims, the issue of their qualified immunity must first be resolved.  A police officer acting under color of law may assert the defense of qualified immunity. Harlow v. Fitzgerald, 457 U.S. 800, 818, 73 L.Ed.2d 396, 102 S.Ct. 2727 (1982); Anderson v. Creighton, 483 U.S. 635, 644, 97 L.Ed.2d 523, 107 S.Ct. 3034 (1987).  A police officer is presumed to be immune from any damages caused by

4

his or her violation of another's constitutional right, and, to overcome this presumption, a plaintiff must allege that the officer's conduct was so egregious that any reasonable person would have recognized a constitutional violation. Gasho v. United States, 39 F.3d 1420, 1438 (9th Cir. 1994).

Under the doctrine of qualified immunity, a police officer is protected from liability if the conduct complained of "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow, 457 U.S. at 818. Qualified immunity attaches if a reasonable officer could have believed his actions were constitutional, even if they were not. Wood v. Ostrander, 879 F.2d 583, 591 (9th Cir. 1989). In determining the issue of qualified immunity, a police officer's conduct must be assessed in light of the information available to the officer at the time he acted. Anderson, 483 U.S. at 641.

To determine whether an officer is entitled to qualified immunity, the court must conduct a two-part analysis. First, the court must consider whether, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right." Saucier v. Katz, 533 U.S. 194, 150 L. Ed. 2d 272, 121 S. Ct. 2151, 2156 (2001). If the answer is "no," the inquiry ends there because there is no constitutional violation. Id. If, however, a constitutional violation could be made out on a favorable view of the plaintiff's allegations, the next step is to inquire whether the particular constitutional right was "clearly established" at the time the officer acted. *Id.* The "clearly established" inquiry must be "undertaken in light of the specific context of the case, not as a broad general proposition . . . , " with the focus being on "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation *he confronted*." Id. (emphasis added).

In this case, there is no constitutional violation because officers are permitted to use deadly force to prevent death or serious bodily injury to

5

themselves or others.

California Penal Code section 835(a) states that officers may use reasonable force to effect an arrest, to prevent escape or to overcome resistance.

Defendants submit the Fourth Amendment excessive force question is resolved by Graham v. Connor 490 U.S. 386 (1989), and 9th Cir. Model Instr. 9.22. Defendants contend the use of force by all Defendant Officers was constitutionally reasonable force under the circumstances. The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. Jackson v. City of Bremerton, 268 F.3d 646, 651 (9th Cir.2001): that ". . . the court's consideration of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." Graham set forth factors that should be considered in determining reasonableness: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id.; see also Billington v. Smith, 292 F.3d 1177, 1184 (9th Cir. 2002). The most important of these factors is the threat posed by the suspect. Smith v. City of Hemet, 394 F.3d 689, 702 (9th Cir. 2005).

"[C]laims of excessive force are to be judged under the Fourth Amendment's objective reasonableness' standard." Brosseau v. Haugen, 543 U.S. 194, 197 (2004). This question is governed by the principles enunciated in Tennessee v. Garner, 471 U.S. 1 (1985) and Graham v. Connor, 490 U.S. 386 (1989). Id. With respect to deadly force, "it is unreasonable for an officer to seize an unarmed, nondangerous suspect by shooting him dead.' But [w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer

6

or others, it is not constitutionally unreasonable to prevent escape by using deadly force.'" Id. (citations omitted).

The police officers are not required to use the least intrusive degree of force possible. The inquiry is whether the force that was used to effect a particular seizure was reasonable. Forrester v. City of San Diego, 25 F.3d 804, 807-08 (9th Cir. 1994)

In this case, officers were faced with the threat of being shot by Brayland Randolph, who was willing to use any amount of force necessary to flee from the police. Under these circumstances, the officers were privileged to use deadly force to protect themselves and any other officers running up behind them from being killed or seriously injured. Since there is clearly no constitutional violation, the officers are entitled to qualified immunity.

Second Affirmative Defense: Brayland Randolph was negligent and his negligence caused his injury. The Defendants must show that (1) Randolph acted or failed to act with reasonable care; and (2) that failure to use reasonable care resulted in his own harm.

Third Affirmative Defense: California Penal Code section 196 permits Officers Wren and Diamond to use deadly force under these circumstances as justifiable homicide. The Defendants must show that (1) the homicide was committed by public officers; (2) was necessary to overcome Randolph's resistance to the execution of some legal process, i.e. detention or arrest.

**(f)  Description of Key Evidence in Support of Affirmative Defenses**

First Affirmative Defense:   Qualified Immunity

1. Brayland Randolph pointed a loaded handgun at them as he attempted to flee the police.

2. Officers Wren and Diamond reasonably perceived the threat of death or serious bodily injury to themselves or any other police officers running up behind

7

them when they saw Randolph point the handgun at them.

3. The Defendant officers were permitted to use deadly force to defend themselves against the threat of death or serious bodily injury created by decedent Brayland Randolph when he pointed a gun at them.

4. Officer Wren fired three rounds, and Officer Diamond fired five rounds as Randolph ran towards and jumped over a four-foot high chain link fence.

5. All rounds were fired rapidly and within 1 ½ to 2 seconds. Randolph was not shot while he was face down on the ground.

6. Randolph's firearm was recovered at the base of the fence he jumped over and matched the description given by Officers Wren and Diamond.

7. Since there is clearly no constitutional violation, the officers are entitled to qualified immunity

Second Affirmative Defense:   Contributory Negligence

1. Brayland Randolph pointed a loaded handgun at them as he attempted to flee the police.

2. Officers Wren and Diamond reasonably perceived the threat of death or serious bodily injury to themselves or any other police officers running up behind them when they saw Randolph point the handgun at them.

3. The Defendant officers were permitted to use deadly force to defend themselves against the threat of death or serious bodily injury created by decedent Brayland Randolph when he pointed a gun at them.

4. Officer Wren fired three rounds, and Officer Diamond fired five rounds as Randolph ran towards and jumped over a four-foot high chain link fence.

5. All rounds were fired rapidly and within 1 ½ to 2 seconds. Randolph was not shot while he was face down on the ground.

6. Randolph's firearm was recovered at the base of the fence he jumped over and matched the description given by Officers Wren and Diamond.

///

Third Affirmative Defense:    Justifiable Homicide (C.P.C. 196)

1. Brayland Randolph pointed a loaded handgun at them as he attempted to flee the police.

2. Officers Wren and Diamond reasonably perceived the threat of death or serious bodily injury to themselves or any other police officers running up behind them when they saw Randolph point the handgun at them.

3. The Defendant officers were permitted to use deadly force to defend themselves against the threat of death or serious bodily injury created by decedent Brayland Randolph when he pointed a gun at them.

4. Officer Wren fired three rounds, and Officer Diamond fired five rounds as Randolph ran towards and jumped over a four-foot high chain link fence.

5. All rounds were fired rapidly and within 1 ½ to 2 seconds. Randolph was not shot while he was face down on the ground.

6. Randolph's firearm was recovered at the base of the fence he jumped over and matched the description given by Officers Wren and Diamond.

**(g)    Statements of third parties.**

None.

**(h)    Evidentiary problems**: Defendants will address evidentiary issues via motions in limine. The major areas of concern are: evidence and arguments about past scandals and incidents involving the LAPD; internal complaints against Defendant officers, and the qualifications of Plaintiffs' expert Roger Clark to testify as to wound ballistics, trajectory analysis, ejection pattern testing, and the quality of the subsequent investigation of the shooting.

**(i)    Issues of Law:**    Whether the Defendant officers are entitled to qualified immunity.  Whether officers are permitted to use deadly force when faced with a loaded gun.

**II.    BIFURCATION OF ISSUES:**

Defendants are requesting the trial be bifurcated into two phases: Phase One:

liability, Phase Two: damages. If the jury does not find a constitutional violation that caused damage, Phase Two is moot. Plaintiffs should not be permitted to discuss the defendant officers' net worth during the initial phase of the case.

### III.   JURY DEMAND:

1. A timely demand for jury trial has been made by Defendants.

2. Attorney's fees pursuant to 42 U.S.C. §1988: Defendants may seek attorney's fees if it is the prevailing party in this action and it can be shown Plaintiffs prosecuted this action in bad faith.

### IV.   ATTORNEYS' FEES

The Defendants anticipate filing a bill of costs at the conclusion of the case should they prevail.

### V.   ABANDONMENT OF ISSUES:

None.

### VI.   DEFENDANT'S WITNESS LIST:

Defendants' witness list will be filed under separate cover.

### VII.   DEFENDANT'S EXHIBIT LIST:

A joint exhibit list will be filed under separate cover.

### VIII.   OTHER ISSUES AFFECTING TRIAL:

None.

DATED:   January 7, 2010

**CARMEN A. TRUTANICH**, City Attorney
**MICHAEL CLAESSENS**, Senior Asst. City Attorney
**CORY M. BRENTE,** Supv. Assistant City Attorney

By: /S/ Denise C. Johnson
**DENISE C. JOHNSON**, Deputy City Attorney

*Attorneys for Defendants* **CITY OF LOS ANGELES, OFFICER CHRISTOPHER WREN and OFFICER JAMES DIAMOND**